IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

---

FRANK R.,
*Appellant*,

*v.*

MOTHER GOOSE ADOPTIONS,
*Appellee*.

No. 2 CA-JV 2015-0120
Filed February 10, 2016

---

Appeal from the Superior Court in Pima County
No. S20140221
The Honorable K.C. Stanford, Judge

**AFFIRMED**

---

COUNSEL

Sarah Michèle Martin, Tucson
*Counsel for Appellant Frank R.*

MyersStrickland, PLLC,[1] Tucson
By Heather M. Strickland and Jessica C. Graves
*Counsel for Appellee Mother Goose Adoptions*

---

**OPINION**

Presiding Judge Vásquez authored the opinion of the Court, in which Judge Miller concurred and Chief Judge Eckerstrom dissented.

---

V Á S Q U E Z, Presiding Judge:

¶1     Frank R. appeals from the juvenile court's order terminating his parental rights to E.E. pursuant to A.R.S. § 8-533(B)(6), for failing to file a notice of paternity in compliance with A.R.S. § 8-106.01, Arizona's putative fathers registry. Frank contends application of the registry to him was unconstitutional because he and E.E.'s mother are California residents and, as a result of her deceptive acts and false statements in an affidavit and to appellee Mother Goose Adoptions, he did not know she had given birth to E.E. in Arizona and had consented to the child's adoption. He also challenges the court's finding that termination of his rights was in E.E.'s best interest.[2]  We affirm.

---

[1] Heather M. Strickland and Scott Myers of the law firm MeyersStrickland, PLLC, were both counsel of record below, although Myers signed the initial and amended severance petitions and other filings and represented Mother Goose throughout the severance hearing. Strickland and Myers were both counsel of record on appeal; however, Strickland filed a Notice of Withdrawal of Counsel on January 4, 2016, informing this court Myers had retired and, as of December 31, 2015, was no longer practicing law. Strickland argued the case before this court.

[2] Mother Goose filed a cross-appeal, challenging the juvenile court's finding that it had not presented sufficient evidence to

## Background

**¶2**      We view the evidence in the light most favorable to upholding the juvenile court's ruling. *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, ¶ 2, 181 P.3d 1126, 1128 (App. 2008). In the summer of 2013, eighteen-year-old Rachel E. and twenty-one-year-old Frank, both California residents, developed an intimate relationship and in early August learned Rachel was pregnant. Rachel and Frank lived near each other with their respective parents in California, but Rachel intermittently lived with Frank in his parents' home until she moved out permanently in November.

**¶3**      In December, Rachel contacted the Adoption Networks Law Center (the Center), an adoption law firm in California, to explore placing the expected child for adoption. Frank and his mother asked Frank's cousin, Alex Joaquin Saenz, a licensed patent attorney in California, to help him assert his parental rights to the child. Saenz testified at the severance hearing that he had contacted the Center in February 2014 and asked to speak to the caseworker on Frank's behalf, conveying that Frank "wanted to claim his right with respect to [Rachel's unborn child]." No one from the Center called him back, all of which Saenz confirmed in a letter to the Center.

**¶4**      Wendy McGreevy, an attorney with the Center, testified at the severance hearing that Rachel had contacted the Center in December 2013. A colleague subsequently asked McGreevy to contact Frank, the person Rachel had identified as the father. When McGreevy spoke to Frank on February 26, 2014, he told her that if the child was his, he would "100% take the baby and raise it." McGreevy therefore recommended that the Center decline working with Rachel because the father of the child was opposed to an adoption.

---

terminate Frank's rights based on the additional ground of abandonment pursuant to § 8-533(B)(1). Mother Goose withdrew its cross-appeal at oral argument in this court.

¶5 In March 2014, unbeknownst to Frank, Rachel and her mother called Mother Goose in Arizona and spoke to Deborah O'Kane, the Executive Director. They discussed placing the child for adoption and Rachel completed the requisite paperwork to begin the process. Both verbally and in forms she submitted, Rachel informed Mother Goose she had no idea who the father of the child was, claiming she had sexual relations with numerous men during the relevant period. She did not tell Mother Goose about having contacted the Center in California, leaving blank a related question in the forms she submitted. Around this time, Rachel and her mother drove to Arizona and met with Mother Goose personnel as well as a physician.

¶6 Mother Goose sent Rachel profiles of potential adoptive parents and in April, when Rachel and her mother traveled to Arizona a second time, they met with a Mother Goose counselor and chose the specific adoptive parents she wanted to adopt her child. Mother Goose arranged and paid for accommodations for Rachel and her mother at a hotel in Phoenix while they waited for the birth of the child. Rachel signed an affidavit in which she stated that no man had acknowledged or claimed paternity of the child or had provided or promised to provide her support during the pregnancy, she did not intend to name any man on the birth certificate as the father, and there was no person she had reason to believe had an interest in the child.

¶7 On May 5, Rachel gave birth to E.E. The adoptive mother attended the birth and her husband arrived the following day. The adoptive parents are from Tennessee and had adopted another child through Mother Goose four years earlier. On May 8, three days after the birth of E.E., Rachel executed a Relinquishment of Parental Rights for Adoption, which provided that she relinquished her rights to Mother Goose and consented to its placement of E.E. for adoption. The following day, Frank asked Rachel about the baby through Facebook. Rachel responded that the child was African American and was not his. That same day Frank again asked about the baby, asked Rachel where she had been, and said he was concerned about whether the baby was healthy and whether Rachel was taking care of the child. He also said, "And if

it's mine, I'm gonna support the baby."  Rachel did not tell him the baby had been born in Arizona.

¶8            Rachel and her mother returned to California on May 10.  Mother Goose filed a petition for termination of parent-child relationship and appointment of guardian for the child on May 14 in Pima County Superior Court.  The petition was verified by its counsel and included various exhibits, including an affidavit from Rachel avowing she did not know the identity of the father and no man had come forward expressing an interest in the child.  At oral argument before this court, Mother Goose's counsel, whose firm also represented Mother Goose below, conceded there was no basis under A.R.S. § 12-401 for believing Pima County was an appropriate venue for filing the petition when the child was born in Maricopa County.

¶9            O'Kane testified at the severance hearing that she knew Rachel was a California resident who had traveled to Arizona for the sole purpose of placing her child for adoption and had returned to California at the time Mother Goose filed the petition.  Nevertheless, Mother Goose alleged in the severance petition that Rachel resided in Arizona and listed her address as that of the hotel where Mother Goose had arranged for Rachel and her mother to stay while in Phoenix.  Mother Goose further alleged it had custody of E.E. and that Rachel had relinquished her parental rights to the child and consented to his adoption by the adoptive parents.  *See* A.R.S. § 8-533(B)(7) (providing as ground for termination of parental rights parents' relinquishment of rights to agency or consent to adoption).  Mother Goose alleged further that the identity of the child's father was unknown and sought to terminate Rachel's rights pursuant to § 8-533(B)(7) and the rights of any potential father pursuant to § 8-533(B)(5) on the ground that no person claiming to be the father had filed and served Rachel with a paternity action within thirty days of service of a notice to potential father pursuant to A.R.S. § 8-106(G).  That notice, which is required in an adoption under § 8-106, was served by publication in Maricopa County, the final of three notices appearing on May 30, 2014.  Mother Goose requested that the court appoint the prospective adoptive parents as guardians of the child,

and vest legal custody in Mother Goose, pursuant to A.R.S. § 8-538(B)(2).

¶10     Mother Goose also initiated a referral pursuant to the Interstate Compact on the Placement of Children (ICPC), *see* A.R.S. § 8-548, requesting that the adoptive parents be permitted to leave Arizona with E.E.  James O'Donnell, Arizona's ICPC administrator, processed that referral and sent O'Kane an email on May 13, stating it appeared from the information he had received from her that Rachel was a California resident and determination of which state had jurisdiction should begin there.  O'Kane immediately responded that Rachel's father lived in California and falsely stated that her mother lived in Arizona and Rachel had come to Arizona to live with her mother and would "continue to split time between both parents."  O'Donnell approved the ICPC request on May 13, and the adoptive parents left Arizona the next day with E.E. and returned to Tennessee.  On July 30, 2014, the juvenile court terminated the parental rights of "John Doe" and relinquished jurisdiction to Tennessee pursuant to A.R.S. § 25-1032(A)(2), a provision of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA).  *See* A.R.S. §§ 25-1001 through 25-1067.

¶11     In the meantime, Frank had seen a photograph of E.E. on Facebook and believed the child looked like him.  In Los Angeles Superior Court, he filed a Petition to Establish Parental Rights (the California petition) in early July 2014, and the court set a hearing on the petition for August 28.  Rachel was served with the California petition at the end of July.  Rachel's mother called O'Kane on July 30, told her about the paternity action, and sent a copy of the petition.  When questioned about Rachel's actions at the severance hearing, O'Kane testified that Rachel had not told the truth when she claimed she had no idea who the father of the child was and when she signed the affidavit to that effect, committing perjury.  O'Kane also admitted that by not completing a portion of Mother Goose's application that required Rachel to state whether she had sought the assistance of another adoption agency in her home state or another state, she essentially had "falsified" its records and failed to provide information.

¶12        On August 25, Mother Goose filed a motion in the juvenile court pursuant to Rule 60(c)(2), Ariz. R. Civ. P., requesting that the court set aside the July 30 order relinquishing jurisdiction. It disclosed it had relied on a statement Rachel had provided in a sworn affidavit suggesting she did not know the identity of the father but that it had learned Frank was claiming an interest in E.E. Mother Goose asserted Tennessee could not proceed with an adoption until Frank's parental rights were terminated. It stated counsel for the adoptive parents had opined that, notwithstanding Arizona's initial relinquishment of its continuing jurisdiction for purposes of the adoption, Tennessee did not have jurisdiction to terminate Frank's parental rights. Accordingly, Mother Goose asked the court to reassert jurisdiction to permit it to file an amended petition to terminate Frank's rights. The court granted the motion that day.

¶13        On August 27, Mother Goose filed its first-amended petition, seeking to terminate Frank's parental rights under § 8-533(B)(6) on the ground he had failed to file a notice of claim of paternity within thirty days of E.E.'s birth, as required by § 8-106.01. Mother Goose failed to state in the amended petition that Frank had filed the California petition to establish his paternity; rather, it falsely avowed there were no other related proceedings in any jurisdiction and again alleged as Rachel's address the address of the hotel where she and her mother had stayed in Arizona.[3]

¶14        On August 28, when Frank appeared for the initial hearing on the California petition, he was served with a motion filed by Rachel through counsel, requesting an order quashing the California proceeding based on the allegation that Arizona was E.E.'s "home state" for purposes of the UCCJEA. *See* Cal. Fam. Code §§ 3421 (setting forth when California has jurisdiction to make initial custody determination), 3422 (identifying when court loses jurisdiction); *see generally* Cal. Fam. Code §§ 3400 through 3465. It

---

        [3]At oral argument before this court, Mother Goose's counsel claimed the incomplete and incorrect information was the result of "an oversight by [her] office."

was then that Frank first learned E.E. was born in Arizona and that Mother Goose had filed a petition to terminate his parental rights in Arizona the day before. On September 26, Mother Goose filed a motion in the juvenile court in Arizona, asking the court to confer with the California court and retain jurisdiction under the UCCJEA. It argued Arizona had been E.E.'s home state when the proceedings began, *see* § 25-1031, it had made a custody determination, and Mother Goose, the agency with legal custody of E.E., retained strong connections to Arizona, *see* § 25-1032. The court set the motion for hearing on October 8.

**¶15** Frank called the juvenile court in Arizona on September 15 and, when court staff returned the call on September 18, he learned attorney Scott Myers represented Mother Goose. That day Frank's mother spoke with Myers, who confirmed Mother Goose had filed a petition to terminate Frank's parental rights. Also on September 18, Frank was served with the first-amended petition to terminate parental rights and to appoint a guardian that Mother Goose had filed on August 27.

**¶16** On October 2, Frank received from Myers a copy of Mother Goose's jurisdiction motion and a notice that the motion would be heard on October 8. Frank traveled to Arizona and filed a pro se response to the first-amended petition on October 6 and attended the hearing on October 8. At that hearing, the juvenile court appointed counsel to represent Frank and ordered genetic testing to determine paternity, which Frank had requested in his response. The court granted the motion to retain jurisdiction and agreed to confer with the California court. On November 4, the court held the UCCJEA hearing, during which the two judges conferred telephonically.[4] The California court set a hearing for

_____

[4] During oral argument before this court, Frank's counsel seemed to suggest that Frank was not represented by counsel at the UCCJEA hearing. Although neither party requested a transcript of that hearing, the minute entry establishes Frank attended telephonically and was represented by the attorney who had been appointed on October 8.

December 10, after which it deferred jurisdiction to Arizona and dismissed the California petition. The juvenile court conducted the initial severance hearing on December 11.

¶17 On February 6, 2015, Mother Goose filed a second-amended petition, which added abandonment as a ground for terminating Frank's rights. And, with respect to its prior allegation that Frank had failed to file a notice of paternity within thirty days of the child's birth, the second-amended petition added, "or within 30 days after it became possible for him to file," stating in its motion to amend the petition that it was clarifying the previously alleged ground. Once again Mother Goose listed the Arizona hotel address as Rachel's address. Mother Goose also alleged falsely that the identity of the father was unknown and that Frank "may be the father of the child," even though deoxyribonucleic acid (DNA) test results contained in a report dated October 28, 2014, established Frank was E.E.'s father.

¶18 The severance hearing took place over six days between February 27 and April 28. On March 24, about a month before the last day of the hearing, Frank filed an ex parte motion in the severance proceeding seeking to establish paternity and incorporating A.R.S. § 25-814(A)(2) (paternity presumed where "[g]enetic testing affirms at least a ninety-five per cent probability of paternity"). He also apparently filed a separate special paternity action under title 25. During the fourth day of the severance hearing, the court consolidated the two actions "for hearing purposes." The juvenile court also entered an order finding Frank was E.E.'s father.

¶19 In June 2015, the juvenile court terminated Frank's parental rights. In its thirty-five-page under-advisement ruling, the court found Mother Goose had not sustained its burden of establishing Frank had abandoned E.E. The court found Rachel's conduct was deceitful and designed to prevent Frank from asserting his parental rights and found O'Kane's statements regarding the ICPC referral had been "false and misleading." Nevertheless, the court terminated Frank's parental rights pursuant to § 8-533(B)(6), finding Frank had not filed a notice of claim of paternity at all, much less within thirty days of when it had become possible for him to do

so, which was, at the earliest on September 27, thirty days after he first learned on August 28 that E.E. was born in Arizona, and at the latest, on November 7, thirty days after the court appointed counsel to represent him on October 8. The court concluded termination of Frank's rights was in E.E.'s best interest. Frank's appeal and Mother Goose's cross-appeal, which it has withdrawn, followed.

**Discussion**

¶20 Frank begins his opening brief on appeal by asserting that the juvenile court failed to decide the central question in this matter, which the court itself framed as "the application of the Arizona Putative Father[s] Registry in termination proceedings to an unwed, California father" who did not know the mother had traveled to Arizona, falsely stated she did not know who the father was, gave birth to the child, and consented to the adoption by the Tennessee couple. Frank maintains "the central issues on appeal are whether Arizona law is applicable to the father at all, whether our Arizona statutes were intended to apply to an out-of-state father who had no reasonable expectation of being haled into court in Arizona, and whether the fraud perpetrated by the mother and furthered by Mother Goose Adoptions undermines the constitutionality of the statutes themselves and that of their application herein."

¶21 We review the juvenile court's order terminating a parent's rights for an abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, ¶ 8, 83 P.3d 43, 47 (App. 2004). "[W]e will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, ¶ 4, 53 P.3d 203, 205 (App. 2002). Unless we can say, "'as a matter of law that no one could reasonably find the evidence [supporting statutory grounds for termination] to be clear and convincing,'" we will not disturb the court's ruling. *Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, ¶ 10, 210 P.3d 1263, 1266 (App. 2009), *quoting Murillo v. Hernandez*, 79 Ariz. 1, 9, 281 P.2d 786, 791 (1955) (alteration in *Denise R.*). A court must apply the law correctly in order to exercise its discretion soundly. *See Allen v. Chon-Lopez*, 214 Ariz. 361, ¶ 9, 153 P.3d 382, 385 (App. 2007).

**The Statutes**

**¶22**        This case involves the interpretation and application of § 8-533(B)(6), Arizona's parental severance statute, and, necessarily, the putative fathers registry, § 8-106.01, questions of law, which we review de novo.  *See In re John M.*, 201 Ariz. 424, ¶ 7, 36 P.3d 772, 774 (App. 2001); *see also Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, ¶ 18, 181 P.3d 1126, 1131 (App. 2008); *Adrian E. v. Ariz. Dep't of Econ. Sec.*, 215 Ariz. 96, ¶ 9, 158 P.3d 225, 228 (App. 2007).  In interpreting statutes, we strive to effectuate the intent of our legislature and, because the language in the statute is the best reflection of that intent, we apply the statute as written unless the terms are not clear.  *See Linda V. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 76, ¶ 8, 117 P.3d 795, 797 (App. 2005).  Consequently, "[w]hen a statute is clear and unambiguous, we apply its plain language and need not engage in any other means of statutory interpretation." *Kent K. v. Bobby M.*, 210 Ariz. 279, ¶ 14, 110 P.3d 1013, 1017 (2005).  In addition, when it is possible, we "'construe statutes to uphold their constitutionality.'"  *Lisa K. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 173, ¶ 9, 281 P.3d 1041, 1045 (App. 2012), *quoting State v. Hargrave*, 225 Ariz. 1, ¶ 42, 234 P.3d 569, 581 (2010).  "'We presume a statute to be constitutional and will not declare an act of the legislature unconstitutional unless convinced beyond a reasonable doubt that it conflicts with the federal or state constitutions.'"  *Id.*, *quoting Graville v. Dodge*, 195 Ariz. 119, ¶ 17, 985 P.2d 604, 608 (App. 1999).  The party challenging a statute has the burden of establishing it is unconstitutional.  *Id.* ¶ 9.

**¶23**        The legislature enacted this state's putative fathers registry in 1994.  1994 Ariz. Sess. Laws, ch. 116, § 2.  Our supreme court surmised in *In re Pima County Juvenile Action No. S-114487*, 179 Ariz. 86, 90 n.2, 876 P.2d 1121, 1125 n.2 (1994), that the legislature did so in response to the situation that arose in that case and cases like it, in which the putative father's rights were severed on the ground of abandonment in order to facilitate the adoption of the child after the mother, but not the putative father, relinquished her parental rights.  When initially enacted, the registry was expressly implicated only in adoption proceedings pursuant to § 8-106.  1994 Ariz. Sess. Laws, ch. 116, §§ 1, 2.  The two statutes were designed to

11

work in tandem to permit the adoption of a child without the consent of a putative father who failed to assert his parental rights by filing a notice of paternity in accordance with the registry and by filing and serving a paternity action within the specified period.[5]

**¶24**        But in 2002, when the legislature amended portions of § 8-106, it amended the severance statute as well, adding § 8-533(B)(6) as an additional ground for terminating a father's parental rights.  2002 Ariz. Sess. Laws, ch. 173, §§ 1, 4.  It made a putative father's failure "to file a notice of claim of paternity as prescribed in section 8-106.01" an independent basis for termination under § 8-533(B)(6).  This process is distinct from the de facto severance that may be effectuated through the adoption process.  Although the ultimate goal of terminating a putative father's rights under this provision may be the facilitation of an adoption, as it is in this case, it is a separate, independent proceeding.  The instant appeal arises out of a severance under § 8-533(B)(6), not an adoption, therefore we consider § 8-106.01 only in the context of the circumstances before us.

**¶25**        The requirements of § 8-106.01 are clear.  Subsection (A) states that

> [a] person who is seeking paternity, who
> wants    to    receive    notice    of    adoption

---

[5]Section 8-106.01(E) provides that a putative father who fails to file a notice of a claim of paternity with the registry, "waives his right to be notified of any judicial hearing regarding the child's adoption and his consent to the adoption is not required . . . ." *See also* §§ 8-106(J) (requiring putative fathers who wish to preserve parental rights and whose consent would be necessary for adoption to file and serve mother with paternity action pursuant to title 25, chapter 6, article 1 within thirty days after completion of service of the notice required by § 8-106(G)); 8-106.01(G) (barring putative father who fails to file paternity action within thirty days of service of notice under § 8-106(G) "from bringing or maintaining any action to assert any interest in the child").

> proceedings and who is the father or claims
> to be the father of a child shall file notice of
> a claim of paternity and of his willingness
> and intent to support the child to the best
> of his ability with the state registrar of vital
> statistics in the department of health
> services.

Subsection (B) of the statute provides that the putative father may file the notice of claim of paternity before a child is born but shall file within thirty days of the child's birth. However, subsection (E) provides that a father who does not file a notice of claim of paternity as provided in subsection (B):

> . . . waives his right to be notified of any
> judicial hearing regarding the child's
> adoption and his consent to the adoption is
> not required, unless he proves, by clear and
> convincing evidence, both of the following:
>
> 1. It was not possible for him to file a
> notice of a claim of paternity within the
> period of time specified . . . .
>
> 2. He filed a notice of a claim of paternity
> within thirty days after it became possible
> for him to file.

¶26            In addressing the constitutionality of § 8-533(B)(6) and § 8-106.01, we are mindful that a parent's right to custody of his or her child is "fundamental," but not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, ¶¶ 11-12, 995 P.2d 682, 684 (2000). Thus, a court may sever parental rights under certain circumstances, so long as the procedures are fundamentally fair and satisfy due process requirements. *Santosky v. Kramer*, 455 U.S. 745, 754 (1982). A putative father's parental rights, however, are inchoate and do not attain fundamental constitutional status unless he takes significant steps to create a parental relationship. *Pima Cty. No. S-114487*, 179 Ariz. at 93-94, 876 P.2d at 1128-29; *see also Caban v. Mohammed*, 441 U.S. 380, 392 (1979). The registry provides putative fathers with a

means of asserting their parental rights by creating a specified, public repository, maintained by an agency of the state, wherein the putative father may acknowledge his paternity, whether potential or established, declare his interest in his child, and state his willingness to support his child. *See* § 8-106.01(A).

¶27        In *Lehr v. Robertson*, 463 U.S. 248, 264-65 (1983), the Supreme Court held that putative fathers registries are constitutional. The Court observed that "the mere existence of a biological link does not merit equivalent constitutional protection" to a developed parent-child relationship. *Id.* at 261. The Court reasoned, "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' his interest in personal contact with his child acquires substantial protection under the due process clause." *Id.*, *quoting Caban*, 441 U.S. at 392 (second alteration in *Lehr*) (citation omitted). The Court concluded New York's paternity registry accommodated and protected the putative father's interest in establishing that relationship. *Id.* at 262-65; *see also* Rebeca Aizpuru, Note, "Protecting the Unwed Father's Opportunity to Parent: A Survey of Paternity Registry Statutes," 18 Rev. Litig. 703, 727 (1999) (putative father registries serve dual purpose of "protecting the rights of responsible fathers and facilitating speedy adoptions of children whose fathers do not wish to assume parental responsibility").

¶28        In *Marco C. v. Sean C.*, this court determined § 8-106.01(B) "clearly and unambiguously sets a time limit that can be excused only under the limited circumstances prescribed in § 8-106.01(E)." 218 Ariz. 216, ¶ 9, 181 P.3d 1137, 1140 (App. 2008). Based on the statute's clear language, we held it must be strictly applied. *Id.* ¶¶ 9-10. We noted that, in enacting the statute, the legislature had "balanced the policy considerations involved and concluded that the theoretical ten-month period between a child's conception and thirty days after the child's birth gives the father an adequate opportunity to file his notice." *Id.* ¶ 9. We acknowledged "the result may be harsh when a father misses this deadline," but added that it is not for the judiciary to "second-guess the legislature's policy decision." *Id.* Thus, we concluded, because the

putative father in that case had filed his notice of paternity on the thirty-first day after the child's birth, the juvenile court did not err in finding the father had failed to comply with the statute, his consent to adoption was not required, and the adoption could proceed over his objection. *Id.* ¶¶ 3, 18.

**¶29** As Frank points out, *Marco C.*, on which the juvenile court in this case relied, involved an Arizona putative father who, based on his having engaged in sexual relations with a woman in this state, had reason to believe and in fact knew the issue of his paternity would arise in this state. In *Marco C.*, however, this court cited *Beltran v. Allan*, 926 P.2d 892, 895-96, 898 (Utah Ct. App. 1996), on which the juvenile court in this case also relied, and cases from other jurisdictions, *see, e.g.*, *Heidbreder v. Carton*, 645 N.W.2d 355, 369-70 (Minn. 2002), *Hylland v. Doe*, 867 P.2d 551, 553, 556-57 (Or. Ct. App. 1994), and *In re Adoption of B.B.D.*, 984 P.2d 967, ¶¶ 2-6, 12 (Utah 1999), in which courts applied their state's putative fathers registries strictly to out-of-state putative fathers. 218 Ariz. 216, ¶ 10, 181 P.3d at 1140-41. However, we did not address the application of Arizona's registry to an out-of-state father in *Marco C.* Nor did § 8-533(B)(6) come into play in *Marco C.*, the appeal having arisen out of an adoption proceeding, not a severance.

**¶30** Here, contrary to Frank's argument, the juvenile court implicitly, if not expressly, determined that as a general proposition, Arizona's putative fathers registry applies to out-of-state putative fathers. The court ruled that the statute was "designed to avoid protracted legal disputes between unwed fathers and potential adoptive parents" and "was also designed for resolving disputes between Arizona and non-Arizona residents who give birth to children in Arizona." As we noted above, *Beltran* and other courts have applied their putative father registries to out-of-state putative fathers. *See, e.g.*, *Heidbreder*, 645 N.W.2d at 360, 375; *Hylland*, 867 P.2d at 553, 556-57; *Adoption of B.B.D.*, 984 P.2d 967, ¶¶ 31-33; *In re Adoption of W*, 904 P.2d 1113, 1115, 1121 (Utah Ct. App. 1995). The juvenile court therefore did not err in finding, whether implicitly or expressly, that, as a general principle, a putative fathers registry can apply to an out-of-state putative father.

**Due Process and Jurisdiction**

¶31        We now turn to Frank's argument that the application of § 8-106.01 to the circumstances of this case violated his due process rights. This argument is intertwined with his assertions that the juvenile court lacked "jurisdiction" to apply Arizona's registry to him and to sever his rights based on his failure to register. Frank argues it was unconstitutional to deny him "the protection of California law" and apply § 8-106.01 to him at all, given Rachel's deceitful conduct and misrepresentations to the court, which was "furthered by Mother Goose Adoptions' obfuscation in its pleadings and intentional lack of candor to the court." He argues he was deprived of notice and an opportunity to be heard and that, even conceding, "for the sake of argument only, that the court had jurisdiction" over him, such jurisdiction did not determine the "choice of law" and he could not "lawfully be denied the protection of California law on the basis that the mother traveled to Arizona and committed perjury that was furthered by Mother Goose Adoptions in order to deny him access to and custody of his child." Blending issues of personal and subject-matter jurisdiction with issues of due process and choice of law, he argues in his briefs on appeal that because of the lack of notice and an opportunity to be heard, the juvenile court had "no jurisdiction to adjudicate such personal rights."

¶32        At oral argument before this court, Frank abandoned his personal-jurisdiction challenge. He conceded the record shows he submitted himself to the jurisdiction of the juvenile court, waiving this claim.[6] We therefore do not address it further.[7] Frank

_____

        [6] Although Frank stated in his response to the severance petition that he believed California has jurisdiction over any petition to establish or terminate his parental rights because that is where he and Rachel reside, he did not expressly state he was objecting to the Arizona proceeding for lack of personal jurisdiction. Additionally, he asked the juvenile court for affirmative relief, including DNA testing and an order denying the petition on the merits, awarding him legal and physical custody of the child, thereby agreeing the

persisted at argument in this court, however, that the court lacked subject-matter jurisdiction. Although some of his arguments were, in actuality, continued challenges to the court's personal jurisdiction over him, he seemed to argue that Arizona did not have jurisdiction under the UCCJEA, because the court's assertion of jurisdiction had been based on Rachel's and Mother Goose's misrepresentation of the true facts, particularly those related to jurisdiction.

¶33 Frank asserted in his pro se response to the severance petition that California had jurisdiction to decide matters related to his parental rights and to hear any termination petition. But in his pretrial statement, Frank listed among the uncontested issues, "[t]he Pima County Juvenile Court has primary jurisdiction to hear this matter." Because neither party ordered a transcript of the UCCJEA hearing in November 2014, we are unable to determine what arguments Frank may have made in opposing Arizona's jurisdiction of the severance proceeding under the UCCJEA. But, during closing argument in the severance hearing, when Frank's counsel seemed to be challenging the court's jurisdiction under the UCCJEA, the

_____

severance proceeding could be litigated in Arizona. *See Davis v. Davis*, 230 Ariz. 333, ¶ 25, 284 P.3d 23, 28 (App. 2012) ("By making an appearance, requesting affirmative relief from the court and taking these other actions before raising any personal jurisdiction issue, Husband consented to Arizona's jurisdiction."); *State ex rel. Ariz. Dep't of Econ. Sec. v. Burton*, 205 Ariz. 27, ¶ 8, 66 P.3d 70, 72 (App. 2003) (Arizona court may exercise personal jurisdiction over non-resident if person "submits to the court's jurisdiction by consent, enters a general appearance, or files a responsive document having the effect of waiving a contest to personal jurisdiction").

[7]Nor do we address Frank's related choice-of-law argument, except to the extent it is intertwined with his due process arguments. He did not assert this as a distinct claim in the juvenile court nor has he developed it as such sufficiently on appeal. *See City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, ¶ 88, 181 P.3d 219, 242 (App. 2008) (appellate court will not address issues or arguments waived by failure to adequately develop them in briefs).

juvenile court asked counsel whether she was requesting that the court "reconsider" its decision to retain jurisdiction based on Rachel's fraudulent and deceptive conduct and Mother Goose's misrepresentations and give the case to the California court. Counsel responded, "I don't think that's appropriate," urging the court to consider that behavior in connection with the severance and "rectify the wrongs that have been perpetrated on my client." Counsel conceded Arizona was the "home state" for purposes of the UCCJEA and that the court should continue to retain jurisdiction.

**¶34** Nor does it appear Frank challenged the California court's order quashing the hearing on his paternity action, deferring jurisdiction to Arizona, and dismissing his California petition.[8] Nevertheless, the issue of a court's subject-matter jurisdiction may be raised at any time, *Health For Life Brands, Inc. v. Powley*, 203 Ariz. 536, ¶¶ 11-12, 57 P.3d 726, 728 (App. 2002), and parties cannot confer jurisdiction on a court if it is lacking, *Sw. Soil Remediation, Inc. v. City of Tucson*, 201 Ariz. 438, n.5, 36 P.3d 1208, 1215 n.5 (App. 2001). In addition, "[t]his court has an independent obligation to evaluate subject matter jurisdiction." *See Angel B. v. Vanessa J.*, 234 Ariz. 69, ¶ 5, 316 P.3d 1257, 1259 (App. 2014). Thus, to the extent Frank is truly challenging the court's subject-matter jurisdiction, we address the argument. Whether the juvenile court had subject-matter jurisdiction of the severance proceeding is a question of law, which we review de novo. *Id.* ¶ 6.

---

[8] As part of his blended subject-matter and personal jurisdiction arguments in his appellate brief, Frank complains he was harmed by not receiving "notice and by his being forced to give up the Petition he filed in California." He further asserts the California court did not appoint counsel for him and he was "blind-sided" by the motion to quash that proceeding. But these are complaints he should have made in the California court. They do not relate to the juvenile court's subject-matter jurisdiction, but are actually part of his fairness and due process arguments, which are addressed below.

¶35        E.E. was in this state when the severance proceeding commenced on May 14, 2014, and, based on Rachel's having relinquished her parental rights to Mother Goose, a licensed adoption agency, for purposes of adoption, E.E. was under Mother Goose's legal control and it was authorized to place him in an approved home. *See* A.R.S. §§ 8-101(3) (defining agency placement adoption); 8-106(A)(5) (acknowledging consent to adopt may be given to adoption agency, which may then place child for adoption); 8-107(D) (providing consent to adopt shall designate an adoption agency or the department of child safety as party authorized to place child for adoption, or a specific person to adopt); 8-126 (authorizing licensing and oversight of adoption agency); 8-130(A) (providing licensed adoption agency may arrange direct placement of child following consent to adoption granted to agency); *see also* Ariz. Admin. Code R6-5-7002, R6-5-7003 (licensing of adoption agency). Arizona had subject-matter jurisdiction of the severance petition. *See* A.R.S. § 8-532 (court has jurisdiction to decide severance petition when child in state). That was not altered by the fact that E.E. left the state immediately following the ICPC placement approval, the same day the petition was filed. In addition, under the UCCJEA, which applies to proceedings to terminate parental rights, *see* A.R.S. § 25-1002(4)(a), Arizona had jurisdiction to make the initial custody determination regarding E.E. because he was born in Arizona and it was his "home state" on the date the severance proceeding commenced. *See* §§ 25-1002(7); 25-1031(A)(1); *see also* § 25-1002(8) (initial custody determination is "the first child custody determination concerning a particular child").[9] Once a court with original jurisdiction issues an initial child custody order, the UCCJEA gives that court exclusive, continuing jurisdiction over all future custody determinations, subject to statutory exceptions. § 25-1032(A); *see also Angel B.*, 234 Ariz. 69, ¶ 8, 316 P.3d at 1260.

---

[9]Rachel having relinquished her parental rights to Mother Goose on May 8, for purposes of § 25-1002(7), which defines "home state," Mother Goose was the "person acting as a parent" when the severance proceeding commenced. *See* § 25-1031(A)(1).

**¶36** Here, unlike in *Angel B.*, 234 Ariz. 69, ¶ 20, 316 P.3d at 1262-63,[10] a court of this state entered the initial custody order and the two courts conferred to determine whether Arizona had and should retain continuing jurisdiction under § 25-1031 and § 25-1032. To the extent Frank argues the juvenile court erred in electing to retain jurisdiction rather than relinquishing to California in light of Rachel's and Mother Goose's conduct, that is not truly a subject-matter jurisdiction question. Rather, "even if a court may exercise jurisdiction under the UCCJEA, the decision [to] do so is" for a trial court to make in the exercise of its discretion. *Cheesman v. Williams*, No. 320446, 2015 WL 3794095, 1 (Mich. Ct. App. June 18, 2015); *see also Wagner v. Wagner*, 887 A.2d 282, ¶ 12 (Pa. Super. Ct. 2005) ("'A court's decision to exercise or decline jurisdiction [under the UCCJEA] is subject to an abuse of discretion standard of review . . . .'"), *quoting Lucas v. Lucas*, 882 A.2d 523, ¶ 4 (Pa. Super. Ct. 2005). Consequently, this is not a question of the court's subject-matter jurisdiction and the challenge was waived.[11]

---

[10] This court observed in *Angel B.* that the juvenile court's exclusive original jurisdiction to decide termination petitions relating to a child in this state, *see* § 8-532, can be harmonized with the provision of the UCCJEA that requires Arizona to "'recognize and enforce a child custody determination of a court of another state if the latter court exercised jurisdiction in substantial conformity with this chapter.'" 234 Ariz. 69, ¶ 12, 316 P.3d at 1261, *quoting* § 25-1053(A); *see also* § 25-1002(4)(a) (UCCJEA applies to proceedings to terminate parental rights). Because an initial custody order had been entered in California in that case and nothing in the record showed the Arizona and California courts had conferred in compliance with the UCCJEA before the Arizona court severed the father's parental rights, this court remanded the case to address the jurisdictional issues. *Angel B.*, 234 Ariz. 69, ¶¶ 19-21, 316 P.3d at 1262-63.

[11] We recognize that under A.R.S. § 25-1038(A), a court of this state "shall decline to exercise its jurisdiction" if the court has jurisdiction "because a person seeking to invoke its jurisdiction has

¶37 Despite Rachel's misrepresentations and Mother Goose's false statements in connection with the ICPC placement of E.E. in Tennessee and in its pleadings, all of which are deeply troubling, the juvenile court did not lack subject-matter jurisdiction of the severance proceeding. *Cf. Hylland*, 867 P.2d at 553-54 (finding that although father had lived in California and child was conceived in that state, Oregon had jurisdiction under UCCJEA to hear adoption proceeding because child was born there and had been living there with adoptive parents, who had colorable claim to custody because they had been appointed as child's guardians and mother had consented to adoption).

**Due Process**

¶38 We now turn to Frank's due process arguments and his claim that application of the statute deprived him of an important personal right without adequate notice and an opportunity to be heard. Rejecting these and similar claims, the juvenile court relied, in part, on *Beltran*, in which the Utah Court of Appeals strictly applied Utah's paternity registry to an out-of-state putative father. 926 P.2d at 895, 897-98. On appeal from summary judgment in favor of the adoption agency, the father in *Beltran* argued he should have been excused from filing an acknowledgment of paternity under a provision of the statute that permitted a father to show it had not been possible for him to comply with the registry during the requisite period of time. *Id.* at 895-96, *citing* former Utah Code § 78-30-4.8(3)(a) through (c), *repealed by* 1995 Utah Laws, ch. 168, § 15.

---

engaged in unjustifiable conduct," unless certain circumstances specified in the statute exist. However, at the time Mother Goose invoked the court's jurisdiction by filing the initial severance petition, it was not aware Rachel had made false statements and it had not, therefore, engaged in "unjustifiable conduct." The court likewise did not exercise jurisdiction because of such conduct. *See Duwyenie v. Moran*, 220 Ariz. 501, ¶ 14, 207 P.3d 754, 758 (App. 2009). Moreover, at least one of the exceptions specified in the statute existed here: California relinquished jurisdiction to Arizona. *See* § 25-1038(A)(2).

The court rejected the California father's argument that he should not have been required to comply with Utah's registry because, like Frank, he had made clear to the mother and the adoption agency he opposed the adoption and because he had filed a paternity action in California and one in Utah. *Id.* at 896.[12] Requiring strict compliance with the statute, not substantial compliance, the court in *Beltran* also rejected the father's argument that the statute was unconstitutional as applied to him because the mother consistently told him she intended to relinquish her rights and consent to the child's adoption. *Id.* at 897.

**¶39**        Frank suggests the juvenile court's reliance on *Beltran* was misplaced because the father in that case knew the mother intended to travel to Utah and place the child there for adoption and chose not to comply with Utah's paternity registry. He argues the Utah Supreme Court's recent decision in *Nevares v. M.L.S.*, 345 P.3d 719, ¶¶ 15, 23-25 (Utah 2015), is far more instructive here. He relies on it for the proposition that to satisfy the requirements of due process, the juvenile court was required to apply California's

---

[12]The court in *Beltran* relied on its earlier decisions in *In re Adoption of W*, 904 P.2d at 1115, 1120-21, in which the court had required strict compliance with the statute despite the fact that the mother had deceived the putative father and he did not know she had given birth in Las Vegas and relinquished the child to adoptive parents in Utah, and *Sanchez v. L.D.S. Soc. Serv*s., 680 P.2d 753, 755 (Utah 1984), in which the Utah Supreme Court rejected the putative father's argument that he had substantially complied with the statute by establishing his parental rights through methods alternative to the putative fathers registry. *Beltran*, 926 P.2d at 896. The Utah Supreme Court recently reaffirmed its decision in *Sanchez*, rejecting a putative father's arguments on appeal from the district court's denial of his motion to intervene in an adoption proceeding that strict application of the registry to him in light of the mother's deceitful conduct violated his procedural and substantive due process rights. *In re Adoption of B.Y.*, 356 P.3d 1215, 1221-22, 1227 (Utah 2015).

paternity law to him, not Arizona's statutes. And, Frank insists, he adequately asserted his parental rights in California by filing and serving Rachel with the California petition in July 2014.

¶40 Mother Goose attempts to distinguish *Nevares* on the basis that there the court did not address the constitutionality of Utah's putative fathers registry. But that is not the most significant distinction. Rather, the result in *Nevares* was determined by Utah's impossibility exception, which differs in material respects from § 8-106.01(E). 345 P.3d 719, ¶ 13. Under the Utah statute an out-of-state putative father is excused from complying with Utah's putative fathers registry if he did not know and could not reasonably have known the child would be placed for adoption in Utah. Utah Code § 78B-6-122(1)(c)(i). Under those circumstances, the father's consent to an adoption is required if he has "fully complied with the requirements to establish parental rights in the child, and to preserve the right to notice of" an adoption "imposed by . . . the last state where the unmarried biological father knew, or through the exercise of reasonable diligence should have known, that the mother resided in before the mother executed the consent to adoption." Utah Code § 78B-6-122(1)(c)(i)(B).

¶41 This portion of Utah's statute essentially is a choice-of-law provision, which does not exist in § 8-533(B)(6) or § 8-106.01. The Utah Supreme Court reasoned in *Nevares* that the statute was intended to incorporate another state's law, in that case Colorado law, under which a father's rights are presumptively preserved unless and until terminated by court order in a proceeding of which the known father must be given notice and an opportunity to be heard. 345 P.3d 719, ¶¶ 17-18. Although Colorado offered other options to a father for asserting and preserving paternal rights, it required nothing more to do so; therefore, the Utah court concluded the father was entitled to notice and an opportunity to be heard in the Utah adoption proceeding. *Id.* ¶ 20. The court concluded further that the father's due process rights would be violated if the statute were to be construed to require him to fulfill requirements Colorado did not impose, "holding him to a legal regime to which he could not reasonably have expected to be bound." *Id.* ¶ 25; *see also In re Adoption of B.Y.*, 356 P.3d 1215, ¶ 33 (Utah 2015) (citing

23

*Nevares* as example of case in which "a father's due process right to be heard is infringed where his rights are foreclosed for failure to comply with the Adoption Act" because he could not have known his child would be born in Utah and placed for adoption).[13]

**¶42** Mother Goose relies on *Heidbreder*, a case factually similar to this one. In *Heidbreder*, the Minnesota Supreme Court affirmed the lower court's strict application of that state's putative fathers registry to an out-of-state father who was deceived by the mother and did not know she had left their home state of Iowa and had gone to Minnesota, where she had given birth to the child and consented to the child's adoption. 645 N.W.2d at 360-62, 369. On the thirty-first day after the child was born, the father learned the mother had given birth in Minnesota, and he mailed the required forms to the Minnesota Fathers' Adoption Registry, which he found on the internet. *Id.* But his registration was one day late; he was required to register no later than thirty days after the child's birth. *Id.* at 365. The court rejected the father's argument that the mother's conduct amounted to fraud that excused his compliance with the Minnesota statute, and even rejected his argument that it had been impossible for him to have timely registered under a provision in the Minnesota statute that is similar to § 8-106.01(E). *Id.* at 365-69.

**¶43** The court in *Heidbreder* also rejected the father's argument that application of the Minnesota statute to him violated

---

[13] In *Ellis v. Social Services Department of the Church of Jesus Christ of Latter-Day Saints*, 615 P.2d 1250, 1255-56 (Utah 1980), the Utah Supreme Court found strong due process considerations in applying Utah's registry to an out-of-state father who could not have known the child had been placed for adoption in that state. The court found "due process requires that he be permitted to show that he was not afforded a reasonable opportunity to comply with the statute." *Id.* at 1256. Thus, the court did not hold that application of Utah's registry to the out-of-state father was, per se, a violation of due process; rather, the due process violation occurred because he was deprived of the opportunity to establish he fell within the impossibility exception.

his due process rights, specifically his right to establish his inchoate parental rights. *See id.* at 372-76. The court concluded the father did not have an established relationship with the child; therefore, "the only due process issue is whether the state 'has adequately protected his opportunity to form such a relationship.'" *Id.* at 373, *quoting Lehr*, 463 U.S. at 262-63. It based its conclusion that the father's limited due process rights had not been violated in part on the fact that under Minnesota's statute, a putative father who failed to timely register but commenced a still-pending paternity action within thirty days of the child's birth, was not prohibited from bringing or maintaining an action to assert his interest in the child while an adoption remained pending. *Id.* at 374-75. The court reasoned that, because the statute did not require such an action to be filed in Minnesota, application of the Minnesota statute to him did not deprive him of the opportunity to assert his parental rights. *Id.* The court stated that the father could have commenced a paternity action in his home state of Iowa or any other state, or filed with the paternity registry in another state, to establish his commitment to the child before the mother consented to the adoption.[14] *Id.* at 375.

---

[14]Unlike Minnesota's statute, Arizona's statutes in the context of an adoption under § 8-106 provide no such alternative means for a putative father to assert his rights. In adoption proceedings, a putative father must not only register under § 8-106.01, he must file a paternity action in Arizona pursuant to title 25 of Arizona's statutes and serve the mother in order to assert his rights, assure that he receive notice of an adoption, and require his consent before an adoption may be completed. *See Marco C.*, 218 Ariz. 216, ¶ 18, 181 P.3d at 1142 (suggesting father's failure to timely register alone sufficient ground for proceeding with adoption without his consent and refusing to address issue related to untimely service of paternity action). *But see David C. v. Alexis S.*, 238 Ariz. 174, ¶¶ 16, 19, 358 P.3d 595, 599 (App. 2015), *review granted* (Ariz. Jan. 5, 2016) (finding "putative fathers registry supplements and does not supplant a father's right to pursue a paternity action" and finding timely service of paternity action required father's notice of adoption and consent of father who failed to timely register). But, even if we were

Notably, the court reached this conclusion in the context of adoption proceedings, applying a statute that provided alternative means for a putative father to assert his rights.

**¶44**        But here, in the context of a severance action, pursuant to § 8-533(B)(6), our legislature has plainly established that a putative father's failure to file a notice of paternity with Arizona's registry alone is a ground for terminating his rights.  Section 8-533(B)(6) provides no exception or alternative means for a putative father to assert his rights and avoid the plain effect of failing to register, nor does it link termination under the statute to adoption proceedings under § 8-106.  The legislature enacted § 8-533(B)(6) eight years after it created the registry, and its intent was made plain by the clear, straightforward language.  *See* 2002 Ariz. Sess. Laws, ch. 173, § 4; 1994 Ariz. Sess. Laws, ch. 116, § 2.  Frank's reliance on the procedures in the adoption context under § 8-106 is therefore unavailing.[15]  The question remains, then, whether the requirements of Arizona's registry could, consistent with due process, be applied to Frank, given that the earliest he learned about E.E.'s May birth in

---

to agree with the court in *David C.*, its reasoning does not apply in the context of a severance under § 8-533(B)(6).

[15]In contrast, § 8-533(B)(5), enacted just a year after § 8-106.01, *see* 1995 Ariz. Sess. Laws, ch. 221, § 5, provides a father's rights may be terminated if he fails to file a paternity action under title 25 within thirty days of service of the notice of impending adoption pursuant to § 8-106(G), which requires a mother to serve on any potential father named by the mother or any putative father who has filed a notice of paternity under § 8-106.01.  Section 8-533(B)(5) is therefore expressly linked to adoption proceedings under § 8-106.  Had the legislature wanted to, it could have made the severance statutes less onerous by providing narrower grounds for termination:  failure to file a notice of paternity under § 8-106.01 or another state's registry, a paternity action under title 25 within the specified time limit, or a paternity action in another jurisdiction.  *See In re Casey G.*, 223 Ariz. 519, ¶ 7, 224 P.3d 1016, 1018 (App. 2010).

Arizona was August 28, well beyond the thirty-day period prescribed in § 8-106.01(B).

**¶45**     The juvenile court found and the record shows that until August 28, when Frank appeared for the hearing on his California paternity petition and was served with Mother Goose's request for an order quashing the California proceeding on the ground that Arizona was E.E.'s "home state," Frank had no notice that E.E. had been born in Arizona or that proceedings relating to E.E. were being conducted in this state.[16]  Rachel knew Frank likely was the father, knew he opposed adoption, and, as the court found, she went to Arizona for the purpose of eluding Frank and thwarting any effort by him to block an adoption.  By the time Frank did learn E.E. had been born in Arizona, E.E. was close to four months old.  Frank is therefore correct that Rachel, and to some degree Mother Goose, created the very situation that formed the basis for the first-amended severance petition.  This court has held in the analogous situation where abandonment is the ground for terminating a parent's rights, a parent's lack of contact and a relationship with a child cannot be the basis for a finding of abandonment for purposes of § 8-533(B)(1), when the petitioner created the circumstances that resulted in a parent's lack of contact.  *Calvin B. v. Brittany B.*, 232 Ariz. 292, ¶ 1, 304 P.3d 1115, 1116 (App. 2013) ("[A] parent who has persistently and substantially restricted the other parent's interaction with their child may not prove abandonment based on evidence that the other has had only limited involvement with the child."); *see also Michael J.*, 196 Ariz. 246, ¶ 25, 995 P.2d at 687

---

[16]It is clear that Rachel's fraudulent representations to Mother Goose resulted in service of the § 8-106(G) notice by publication in Arizona.  We agree with Frank this could not fairly be regarded as adequate notice to him of the impending adoption.  But as we stated above, the notice required under that statute is not implicated in a severance proceeding under § 8-533(B)(6).  In contrast, § 8-533(B)(5) provides that a father's parental rights may be terminated based on his failure to file a paternity action within thirty days of completion of service of the notice under § 8-106(G).

(Department of Child Safety "'may not unduly interfere with'" parent-child relationship and argue parent's rights should be terminated based on abandonment), *quoting Pima Cty. No. S-114487*, 179 Ariz. at 94, 876 P.2d at 1129.

**¶46** But we find unpersuasive Frank's contention that he should be exempt from the requirements of the statute under a theory of common law fraud based on Rachel's deception and Mother Goose's false representations in this proceeding. We note, too, as the court suggested in *Heidbreder*, 645 N.W.2d at 366-68, if the legislature had wanted the mother's deception and concealment of facts related to the child's birth, including the place of birth, to excuse a putative father from strictly complying with the statute, it would have created an exception for that kind of conduct. *See In re Casey G.*, 223 Ariz. 519, ¶ 7, 224 P.3d 1016, 1018 (App. 2010). Nevertheless, even in the face of the deceptive conduct here, we think Arizona's impossibility provision, although different from Minnesota's or Utah's, affords an out-of-state father adequate protection and the manner in which the juvenile court applied that provision did not violate Frank's substantive or procedural due process rights. *See* § 8-106.01(E).

**¶47** Significantly, the juvenile court did not terminate Frank's parental rights because he had failed to register within thirty days of E.E.'s birth, a result that could fairly be characterized as absurd and a violation of due process under the circumstances of this case.[17] Had the court reached that conclusion, we would have agreed with our dissenting colleague and would have reversed the court's ruling. Rather, the court implicitly found that it had not been possible for Frank to register within that period and, based on the impossibility exception under § 8-106.01(E), found the time period commenced at the earliest on August 28, 2014, the date on which

---

[17] We reject as absurd Mother Goose's assertion at oral argument before this court that until a national putative fathers registry is created, a putative father can only be certain that his rights are protected if he registers with every registry in every state when he knows he has or might have impregnated a woman.

Frank admitted he first learned E.E. was born in Arizona, requiring him to register by September 27. The court found, at the latest "the time limit began to run [on] October 8, 2014[,] when he was appointed Arizona counsel." Therefore, the court concluded, Frank was "required to register no later than November 7, 2014." That interpretation and application of the statute avoided the absurdity of requiring Frank to comply with the statute of a state where neither he nor the child's mother lived or had a relationship, and where he did not know and had no reason to know the child would be or had been born.

¶48        But Frank did not file a notice of paternity with the registry at any point, much less within thirty days after he had actual notice of the child's birth in Arizona. Despite their improper conduct, neither Rachel nor Mother Goose prevented Frank from filing a notice of paternity within thirty days after August 28, that is, by September 27 at the earliest or within thirty days of October 8, which was November 7, at the latest; that was Frank's decision. The primary deception had already occurred by the time the thirty-day-period commenced for purposes of the impossibility exception. As the juvenile court correctly found, "[t]he deceitful acts of the mother do not void the duty of the unwed father to strictly comply with registration . . . . The father had the ability to register notwithstanding the mother's fraudulent practices and chose not to do so."

¶49        Frank suggests that in light of the important right here and the actions he took to assert and preserve his rights—filing and serving the California petition and coming to Arizona to litigate the severance petition and filing a response—the juvenile court should not have required him to register at all. Frank essentially is asking this court to find that substantial or substitute compliance with the statute should have been sufficient under the circumstances of this case. There is facial appeal to his argument that he had already put Rachel, Mother Goose, and the adoptive parents on notice of his opposition to the adoption and desire for custody of E.E., and our dissenting colleague would reverse on that basis. But neither the statute nor case law supports this argument.

**¶50**     This court has already held that the putative fathers registry statute must be strictly applied; substantial compliance is insufficient. *Marco C.*, 218 Ariz. 216, ¶¶ 9, 10, 181 P.3d at 1140-41; *see also Heidbreder*, 645 N.W.2d at 369 (declining to "carve out a substantial compliance exception" and finding legislature's inclusion of impossibility exception reflects it did not intend to excuse compliance based on substantial compliance). Nor is substitute compliance sufficient. As stated above, had the legislature wanted to, it could have provided alternative grounds for terminating a putative father's parental rights and not made failure to comply with § 8-106.01 alone an independent, discrete basis for termination. It could have carved out exceptions to its application for putative fathers who have otherwise sought to develop their inchoate rights, such as a fraud exception or a circumstance in which substantial or substitute compliance would have sufficed. But it did not do so. Rather, it seems to have made a policy decision to draw a bright-line rule with respect to putative fathers' assertion of their rights. While we agree with the dissent that the result may be harsh in this case in light of egregiously deceptive conduct, creating a fact-based excuse for compliance with the statute takes us down a potentially slippery slope, where other putative fathers may argue their acts gave the relevant parties notice of their assertion of their rights and rendered compliance superfluous. But it is not for the courts to "rewrite statutes to effectuate a meaning different than the one the legislature intended." *Parker v. City of Tucson*, 233 Ariz. 422, ¶ 20, 314 P.3d 100, 108 (App. 2013). Unless the application of a clear, unambiguous statute according to its plain terms results in consequences that are impossible or absurd, we will not infer terms that do not exist because the language our legislature used is generally conclusive evidence of its intent. *Reeves v. Barlow*, 227 Ariz. 38, ¶ 12, 251 P.3d 417, 420 (App. 2011); *see also In re Nickolas S.*, 226 Ariz. 182, ¶ 18, 245 P.3d 446, 450 (2011) ("[C]ourts cannot salvage statutes by rewriting them because doing so would invade the legislature's domain."); *City of Phoenix v. Butler*, 110 Ariz. 160, 162, 515 P.2d 1180, 1182 (1973) (courts do not "rewrite statutes," rather it is for legislature to determine "the appropriate wording" of a statute and "the court may not substitute its judgment for that of the Legislature").

**¶51**        In any event, Frank did not file a paternity action in Arizona until March 24, 2015, nearly seven months after he first learned E.E. had been born in Arizona.  To the extent Frank is arguing that because he is an out-of-state father, the California petition should be regarded as sufficient compliance with the registry, we disagree with that argument as well.  The clear language of the statute does not support that interpretation.[18]

**¶52**        The decision by another division of this court in *David C.*, on which Frank relies in his reply brief, does not persuade

---

[18]Although we reject Frank's apparent argument that by filing his California petition he adequately asserted his rights and that the petition, together with his response to the severance petition, should be viewed as compliance with § 8-106.01, we are not certain in any event that he adequately established his rights under California law.  Frank asserts his petition was timely under California law, citing Cal. Fam. Code § 7630, but the validity of that assertion is unclear in light of testimony during the severance hearing, particularly that of Ted Youmans, a California attorney with expertise in the area of adoptions and guardianships, who litigated two of California's primary cases regarding unwed fathers.  Youmans explained that although there is no paternity registry in California, alleged fathers must come forward during the mother's pregnancy and demonstrate full commitment to a child and must file a petition, which can be filed during pregnancy, to establish himself as a father and attain what is referred to as "presumed father" status, entitling him to notice of all proceedings and requiring his consent for an adoption.  He did not believe Frank had risen to the level of a presumed father whose consent would be necessary.  Although he testified there is no fixed deadline for filing the petition, Wendy McGreevy, the attorney from the Center, testified that under Cal. Fam. Code § 7630 as well as §§ 7664 through 7666, Frank had thirty days from either the child's birth or notice of alleged paternity, whichever comes first, to file the petition.  Based on her testimony, Frank, who testified he knew Rachel's due date was May 5, 2014, does not appear to have filed a timely petition under California law.

us we must reach a different conclusion here. That case, unlike this one, involved an appeal from the juvenile court's grant of the putative father's motion to set aside an adoption. 238 Ariz. 174, ¶ 1, 358 P.3d at 596. The juvenile court in that case had granted the putative father's motion because although the father had not filed a notice of claim of paternity under § 8-106.01, he had filed and served the mother with a paternity action under title 25 within thirty days of the § 8-106(G) notice, which was served by publication. *Id.* ¶¶ 9, 10. The court concluded "the putative fathers registry supplements and does not supplant a father's right to pursue a paternity action." *Id.* ¶ 16. The court distinguished *Marco C.* based on the fact that in that case, the father had not timely served the mother with the paternity action and, therefore, the outcome in that case would have been the same without regard to the waiver provision of § 8-106.01(E). *Id.* ¶ 21. The court added, in any event, "we respectfully disagree with the reasoning of *Marco C.* insofar as it holds that filing with the putative fathers registry is a necessary precondition in all cases in which a father asserts his parental rights." *Id.* ¶ 21.

¶53 Similarly, in an earlier decision, another department of this court seemed to suggest that, but for the fact that the mother had not been served with the father's initial or amended Texas paternity complaint within thirty days of service on the father of the notice under § 8-106(G), the Texas action might have satisfied the requirement of § 8-106(G)(3) and (4), requiring the filing of a paternity action under title 25. *Jared P. & Glade T.*, 221 Ariz. 21, ¶¶ 15-16, 209 P.3d 157, 160 (App. 2009).

¶54 We need not resolve the possible conflict between the decisions by two departments of this court. Neither case involved termination of the putative father's rights pursuant to § 8-533(B)(6) and the requirements of § 8-106.01 in the context of a severance proceeding. Indeed, in *Jared P.*, the court noted the distinction between an action to terminate a father's rights pursuant to § 8-533(B)(5), failure to file a paternity action "as prescribed in § 8-106, subsection G," and notice and consent requirements in § 8-106. 221 Ariz. 21, ¶ 30, 209 P.3d at 163. As we previously stated, nothing in § 8-533(B)(6) states or even suggests that filing a paternity action,

whether in Arizona or another state, takes the place of the putative father's obligation to file a notice under the putative fathers registry.

¶55        As part of his due process arguments, Frank appears to assert a choice-of-law issue, suggesting California law should have been applied.  We have addressed the application of California law in this matter in various regards above, but Frank did not raise a true choice-of-law argument below.  The gravamen of his argument was that because of the fraud perpetrated by Rachel and Mother Goose, the proceedings were unfair, he was deprived of notice, and his due process rights were violated.  He argued he was not required to comply with Arizona law "because he had already asserted his interest in this child [and] . . . had given notice to the world that he was" a putative father seeking "orders to find him to be the legal father."  And, he argued, he protected his rights with the pro se response to the severance petition that he filed in October.  His attorney asserted, "[W]hat would his filing [with the putative fathers registry] have accomplished that had already not been accomplished[?]"  But Frank did not argue below that he was entitled to application of California law, only that under the present facts, no purpose would be served by registering.  The issue is therefore waived and having already addressed these arguments in the context of Frank's due process claims, we do not address them further.  *See Kimu P. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 39, n.3, 178 P.3d 511, 516 n.3 (App. 2008) (parent waives claims raised for first time on appeal).

¶56        Frank also failed to adequately preserve any argument that his rights under the Fifth and Fourteenth Amendments to the Constitution were violated because Mother Goose is a state-licensed agency and, therefore, its deception was "state action" that deprived him of his fundamental right to parent and develop a bond with his child.  Accordingly, we do not address it further.  *See id.* (parent waives claims, including constitutional claims, raised for first time on appeal).  In any event, this argument overlapped with his due process arguments, which we have addressed.

**Child's Best Interest**

¶57 Frank also challenges the juvenile court's finding that termination of his parental rights is in the child's best interest. He contends that, because he has a fundamental constitutional right to the care, custody, and control of his child, it was inappropriate for the court to compare his circumstances with those of the adoptive parents. He argues that when the interest is "between a fit parent, the father, and a private third party, Mother Goose Adoptions, both parties do not begin on equal footing." To the extent Frank is suggesting Mother Goose was required to prove him unfit, he is mistaken.

¶58 A court may not terminate a parent's rights unless the court finds clear and convincing evidence establishes one of the statutory grounds set forth in § 8–533(B), *Michael J.*, 196 Ariz. 246, ¶ 12, 995 P.2d at 685, and a preponderance of the evidence establishes severance is in the child's best interests, *Kent K.*, 210 Ariz. 279, ¶ 22, 110 P.3d at 1018. We do not reweigh the evidence on appeal because "[t]he juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M.*, 203 Ariz. 278, ¶ 4, 53 P.3d at 205. Thus, we view the evidence in the light most favorable to upholding the order. *Manuel M.*, 218 Ariz. 205, ¶ 2, 181 P.3d at 1128.

¶59 As Frank acknowledged at oral argument before this court, the best-interest determination in this case, as in any severance proceeding, is a highly discretionary determination for the juvenile court to make, and we give great deference to its decision. *Cf. Black v. Black*, 114 Ariz. 282, 284, 560 P.2d 800, 802 (1977) (finding, in marital dissolution and custody action, that trial judge is in the best position to determine the issues and "is given wide discretion in deciding what will be in the best interests of the child"). We will not disturb the court's order unless the factual findings upon which it is based "are clearly erroneous, that is, unless there is no reasonable evidence to support them." *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, ¶ 2, 982 P.2d 1290, 1291 (App. 1998).

**¶60**         The juvenile court's order reflects that it considered and weighed the evidence relevant to E.E.'s best interest. *See Demetrius L. v. Joshlynn F.*, No. CV-15-0274-PR, ¶¶ 1, 15-17, 2016 WL 116104 (Ariz. Jan. 12, 2016) (reviewing criteria for best-interest determination in severance and finding same factors applicable in private severance, including prospect of adoption, as in proceeding initiated by the state). The court considered Frank's conduct before E.E. was born, the fact that Frank's paternity has been established, and his wish to establish a relationship with the child. The court stated it gave "special, presumptive weight to the father's natural desire to raise his own child," finding that desire to be "genuine and heartfelt." The court considered the benefit and detriment to the child of granting and denying the severance petition but concluded, "Staying in the same home, environment and surroundings that he has known since birth will benefit the minor and not cause trauma to the child. Childhood stability is an important but not a controlling factor in determining the best interest of the minor." The court concluded "that given all the circumstances, it is in the best interests of the child to sever the parental rights of the father."

**¶61**         The juvenile court carefully weighed the evidence before it and did not consider inappropriate factors. The evidence supports the court's findings that relate to E.E.'s best interest and therefore supports its conclusion that ultimately termination of Frank's parental rights is in E.E.'s best interest. We have no basis for disturbing that ruling.

**Sanctions**

**¶62**         This case raises serious concerns about the conduct of Mother Goose and its counsel throughout these proceedings. In addition to blatant misrepresentations by Mother Goose's Executive Director in connection with the ICPC referral, the pleadings were filed in the Pima County Juvenile Court without regard to this state's venue statute and repeatedly contained materially inaccurate allegations. We do not believe, however, that our authority to impose sanctions under Rule 25, Ariz. R. Civ. App. P., which applies to juvenile appeals, *see* Ariz. R. P. Juv. Ct. 103(G), authorizes this court to impose sanctions for conduct that occurred in the juvenile court. Moreover, there may be factual and other questions relating

35

to this conduct that are for the juvenile court to assess and resolve, not this court. However, we can, and do, impose sanctions against Mother Goose and its attorneys for its frivolous cross-appeal.

¶63 "[A] frivolous appeal is one brought for an improper purpose or based on issues which are unsupported by any reasonable legal theory." *Johnson v. Brimlow*, 164 Ariz. 218, 222, 791 P.2d 1101, 1105 (App. 1990). Because there is a fine line between a frivolous appeal and one that simply lacks merit, we use sparingly the power to sanction attorneys or litigants for prosecuting frivolous appeals. *Price v. Price*, 134 Ariz. 112, 114, 654 P.2d 46, 48 (App. 1982). Based on the record before us, and overwhelming evidence that Rachel and Mother Goose created the circumstances that were the primary basis for Frank's purported abandonment of E.E., we find it frivolous for Mother Goose to have challenged the juvenile court's finding that Mother Goose did not sustain its burden of proving Frank abandoned E.E.

¶64 We commend Mother Goose's counsel for withdrawing the cross-appeal at oral argument. But by that point, Frank's counsel had been compelled to answer Mother Goose's opening brief and prepare for argument, and this court was required to review the issue as well. It is entirely appropriate for this court sua sponte to impose sanctions on parties or their attorneys for burdening this court with a meritless appeal. *Id.* We therefore award Frank reasonable attorney fees against Mother Goose and its counsel as a sanction under Rule 25, upon compliance with Rule 21, Ariz. R. Civ. App. P.

## Disposition

¶65 By affirming the termination of Frank's parental rights, we do not in any respect condone Rachel's conduct or that of Mother Goose and possibly its counsel.[19] And we agree with our dissenting

---

[19] Similarly, this decision should not be construed as expressing any opinion about non-custodial causes of action Frank may assert for the misconduct.

colleague that Rachel's dishonesty and Mother Goose's "self-serving 'oversights'" have resulted in litigation that "can have only an unsettling outcome," particularly at this juncture. We also share the juvenile court's concern that our decision "may on its face encourage mothers to seek interstate adoptions in Arizona without notice to a likely and known father." But, as that court observed, "[s]uch an outcome would be rare when the father registers with the putative father registry within thirty days of prompt discovery of the Arizona birth," which would eliminate § 8-533(B)(6) as a ground for termination of a father's rights. The record and the court's ruling reflect that it correctly applied the law and carefully considered and weighed the evidence before it. Therefore, although we do so reluctantly, as the dissent notes, we affirm the juvenile court's order terminating Frank's parental rights pursuant to § 8-533(B)(6).

E C K E R S T R O M, Chief Judge, dissenting:

**¶66**        Due to the dishonest actions of the birth mother and the strategic, self-serving "oversights" of an adoption agency, this court is faced with resolving litigation that now, over twenty months after E.E's birth, can have only an unsettling outcome. This court must render a decision that has the practical effect of either: (1) removing E.E. from the only parents and family he has ever known in his young life or (2) depriving a father, who has persistently asserted his desire to parent his child, of any legal status with regard to his son and, in so doing, rewarding unconscionable behavior by the birth mother and adoption agency.

**¶67**        The majority's scholarly, comprehensive opinion aptly articulates the controlling legal principles that address Frank's claims and reluctantly rejects them. I join in that well-written opinion in every respect but one.

**¶68**        The majority and the trial court have correctly found that Frank could not have possibly complied with Arizona's requirement that he register as a putative father until, at the earliest, August 28, 2014. Both conclude, however, that his failure to file a notice of paternity pursuant to A.R.S. § 8-106.01 thereafter constituted a lawful ground to terminate his parental rights pursuant to A.R.S. § 8-533(B)(6). *Supra* ¶¶ 49-51. But by that time,

when Frank's intention to assert his paternity had been unequivocally demonstrated through a motion in California court, and when Mother Goose had moved in an Arizona court to terminate Frank's parental rights, any § 8-106.01 filing would have served no purpose whatsoever. At that stage in the proceedings, our legislature could not have intended that a putative father perform a futile and superfluous act to preserve his fundamental right to parent. *See Stanley v. Illinois*, 405 U.S. 645, 651 (1972).

¶69 Our state requires that putative fathers file a notice of paternity pursuant to § 8-106.01 or risk the termination of their parental rights. § 8-533(B)(6). In so filing, the putative father must both assert his paternity and avow that he possesses the "willingness and intent to support the child." § 8-106.01(A). That requirement, and the attendant statutory scheme, protects the putative father by assuring that no adoption may occur without the father receiving a procedural opportunity to file a paternity action pursuant to title 25. *See* A.R.S. §§ 8-106.01(G) (giving father 30 days to file paternity action); 8-106(G) (requiring that each putative father who has registered under § 8-106.01 receive notice alerting him of right to challenge adoption); 25-801 through 25-818 (title governing paternity proceedings). Perhaps most importantly, the registry protects the interests of the child by requiring that any assertions of paternity be made promptly so that the child's permanent home can be established with minimal delay. *See* § 8-106.01(G) (putative father to file paternity action within thirty days of § 8-106 notice of adoption).

¶70 By the date on which my colleagues agree that § 8-106.01 registration was first possible, each of the legislative purposes of such filing had already been achieved by the process of litigation or previously defeated by the strategic actions of the mother and adoption agency. By August 28, 2014, Frank had filed an action for paternity in California demonstrating his intention and willingness to support the child. Rachel and Mother Goose had thereafter received legal notice of that filing and had reacted by moving, in Arizona court, to terminate Frank's paternity. Thus, our state court and all potential litigants had been placed on proper legal notice of Frank's intention to assert his paternity and an Arizona proceeding

had been initiated which, properly conducted, would provide Frank a procedural opportunity to defend his parental rights.

**¶71**  Regrettably, the last purpose of § 8-106.01—to assure that any assertions of paternity be resolved in our courts promptly—had not been achieved due to the dishonesty of the mother in failing to list Frank as a potential father and provide prompt notice to Frank of her intent to seek adoption as required under § 8-106(F) and (G). But Frank, who had persistently asserted his desire to parent the child, bore no responsibility for that delay. Nor could a superfluous § 8-106.01 filing of a notice of paternity thereafter remedy the delay. At that stage in the proceedings, the sole effect of Frank registering as a putative father pursuant to § 8-106.01 would be to provide notice that he was asserting his parental rights—a *sine qua non* of the Arizona action to terminate Frank's paternity, which had already commenced. During oral argument, Mother Goose conceded that Frank's failure to comply with § 8-106.01 after August 28, 2014, did not cause any further delay in the proceedings.

**¶72**  The majority maintains that Frank's actions, in filing the claim of paternity in California and promptly contesting Arizona's motion to terminate, can be viewed only as substantial compliance with the requirements of § 8-106.01 and that strict compliance was still required. *Supra* ¶ 50. But whether a particular legislative scheme requires substantial or strict compliance is a question of legislative intent. *See Marco C. v. Sean C.*, 218 Ariz. 216, n.2, 181 P.3d 1137, 1140 n.2 (App. 2008) (citing Arizona cases so holding). I agree there is sound logic in requiring strict compliance with time deadlines designed to protect the permanency interests of the child at the expense of an ambivalent and dilatory putative father, a clear legislative purpose of § 8-106.01. *See id.* ¶ 9. But I can fathom no legislative purpose at all in similarly requiring a father to file a functionally superfluous notice when, as here, litigation to clarify his paternal rights has already commenced with full notice to all parties. *See David C. v. Alexis S.*, 238 Ariz. 174, ¶¶ 16-21, 358 P.3d 595, 599 (App. 2015) (where father has timely filed paternity action, compliance with § 8-106.01 is unnecessary; "the putative fathers registry supplements and does not supplant a father's right to pursue a paternity action"); *cf. Owens v. City of Phoenix*, 180 Ariz. 402,

409, 884 P.2d 1100, 1107 (App. 1994) (excusing failure to exhaust administrative remedies based on futility). To require strict compliance under the circumstances here would transform § 8-106.01 into nothing more than a "pitfall for the unwary." *Nielson v. Patterson*, 204 Ariz. 530, ¶ 13, 65 P.3d 911, 914 (2003). In the absence of any statutory language expressly compelling another result, we should not assume from legislative silence that our legislature intended such an absurd and unjust result. *See State v. Affordable Bail Bonds*, 198 Ariz. 34, ¶ 13, 6 P.3d 339, 342 (App. 2000) ("'Statutes must be given a sensible construction that accomplishes the legislative intent and which avoids absurd results.'"), *quoting Ariz. Health Care Cost Containment Sys. v. Bentley*, 187 Ariz. 229, 233, 928 P.2d 653, 657 (App. 1996).

¶73　　　Therefore, under all the circumstances of this case, Frank's failure to file a superfluous notice of paternity pursuant to § 8-106.01 should not constitute grounds for terminating his parental rights. I join the well-reasoned majority opinion in all other respects.