NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JESSICA H., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, C.L., C.L., *Appellees*.

No. 1 CA-JV 16-0466
FILED 8-8-2017

Appeal from the Superior Court in Maricopa County
No. JD 527381
The Honorable Timothy J. Ryan, Judge

**AFFIRMED**

COUNSEL

Denise L. Carroll, Esq., Scottsdale
By Denise L. Carroll
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Ashlee N. Hoffmann
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Margaret H. Downie joined.

---

**C R U Z**, Judge:

¶1　　　　Jessica H. ("Mother") appeals from the superior court's decision severing her parental rights. Mother argues the Department of Child Safety ("DCS") failed to prove the statutory grounds for termination. For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

¶2　　　　Mother is the biological mother to C.W.L., born on July 13, 2009, and C.C.L., born on June 11, 2010 (collectively, the "Children"). Robert L. ("Father") is the fiancée to Mother, and is listed on the birth certificates as the biological father to C.W.L. and to C.C.L.[1] Mother used prescription narcotics while pregnant with C.C.L., who was subsequently born substance-exposed and who spent ten days in the hospital for drug withdrawal. C.C.L. was born at approximately 36 weeks gestation. Over the next three years, Mother reported multiple inaccuracies regarding C.C.L.'s birth, including that he was born at between 31 and 32 weeks gestation premature with severe lung problems and cardiac arrest, and that he had to be intubated, none of which appears in the medical records. As a result of Mother's mischaracterization of C.C.L.'s medical history and health, C.C.L. underwent a series of invasive medical tests and surgical procedures.

¶3　　　　In November 2013, the Phoenix Police Department ("PPD") and the Office of Child Welfare Investigations[2] began investigating Mother for child abuse: a report alleged Mother had offered C.C.L. prescription narcotics; and a witness suspected Mother may have been fabricating C.C.L.'s many illnesses. PPD interviewed C.C.L.'s physicians, who

---

[1]　　The superior court terminated Father's parental rights in November 2016. Father is not a party to this appeal.

[2]　　The Office of Child Welfare Investigations is part of the Arizona Department of Child Safety.

validated the concerns: the doctors "had discussed these children on more than one occasion and the concern is that [Mother] wants something to be medically wrong"; and the Children "keep having tests, and [Mother] keeps pushing, pushing, and pushing." In addition to worries about Mother's continued insistence there were medical emergencies, there were substantiated concerns that Mother was providing discrepancies in the information she gave to C.C.L.'s multiple doctors. In the course of PPD's investigation, the Children's medical records were forwarded to Dr. Kathryn Coffman, Division Chief of the Child Protection Team at Phoenix Children's Hospital, who reported a number of concerning inconsistencies. Dr. Coffman determined that Mother had: misrepresented C.C.L.'s birth history; claimed that C.C.L. was diagnosed with IPEX syndrome, a diagnosis unsupported by any medical records; and reported both Children experienced chronic and persistent gastrointestinal issues, which resulted in C.C.L. undergoing multiple esophagogastroduodenoscopies ("EGD") and colonoscopies.

¶4            Due to Mother's misrepresentations, C.C.L. underwent invasive surgeries to have a gastrostomy tube ("G-tube") inserted into his stomach and a Mediport placed in his vascular system. In her final assessment, Dr. Coffman believed that the Children were in danger of medical neglect, and recommended that the Children be removed from the home.

¶5            Based on Dr. Coffman's conclusion, DCS removed the Children from Mother's custody and filed a dependency petition in January 2014, alleging they were dependent due to Mother's medical neglect and her inability to parent due to mental-health and domestic-violence issues.[3]

¶6            Dependency was found in December 2014, with a case plan of family reunification. The parents disagreed that any medical neglect was

---

[3]          Mother has, on two occasions, assaulted Father. On July 17, 2010, Mother was arrested for assault for "hitting [Father] in the face, scratching and slapping him, [] trying to strangle him," and digging her fingers into Father's mouth, causing him to bleed. Mother appeared heavily intoxicated and the assault occurred in front of five-week-old C.C.L., who was directly behind Father as he was being attacked. At the time of the arrest, police found Mother to have outstanding warrants in Tempe, Scottsdale, and Chandler. On November 5, 2012, Mother was arrested for assault for striking Father in the nose, causing him to bleed; Mother again appeared to be intoxicated. At the time of arrest, Mother had an outstanding Chandler misdemeanor warrant.

occurring, did not believe there was any reason for the Children to be out-of-home, stated they were only complying with doctors' orders, and, if the Children were returned, would continue to parent as they had before. As such, DCS required that "Mother will need to report medical history and conditions accurately," "gain insight into her own mental health condition," and "acknowledge the reasons why her children came into care and accept responsibility and not blame others." Dr. Coffman later confirmed that after DCS became involved and removed the Children, C.C.L. had his G-tube and Mediport removed, and that any feeding concerns were due to behavioral, not medical, issues. After being taken out of Mother's care, C.C.L. was described as a "normal child."

¶7 In order to help Mother reunify with the Children, DCS referred her for an array of services, including: a psychological evaluation; a psychiatric evaluation; therapeutic visitation; individual counseling; TASC random urinalysis testing; TERROS substance abuse assessment and treatment; and domestic violence classes through the community.

¶8 Mother refused to meet with Dr. Bursch, a specialist in cases of suspected medical neglect or medical child abuse. Mother declined to participate in a psychological evaluation for more than a year, finally meeting with Dr. Mastikian in March 2015. Dr. Mastikian diagnosed Mother with post-traumatic stress disorder, borderline intellectual functioning, opioid-use disorder (severe), and borderline personality disorder. Dr. Mastikian testified at the severance hearing that he also considered diagnosing Mother with factitious disorder, also known as Munchausen Syndrome by Proxy, but she did not provide enough evidence to fully support it, based on her defensive and reserved manner in presenting information. Mother's results in the evaluation were "suggestive of an individual who approached the test in a defensive manner by failing to validate common flaws typically endorsed by most."

¶9 Dr. Mastikian opined that the Children would be at risk for future abuse, neglect, or harm, and Mother's mental-health issues could lead to behavioral problems and academic difficulties in the Children. His prognostic impression at that point was "*guarded to poor* due to [Mother's] lack of insight, impaired judgment, and the severe and unpredictable nature of her personality disorder." Dr. Mastikian further noted that it was "foreseeable that treatment [would] take quite some time to see genuine and sustained changes in cognition and behaviors." Based on his evaluation, he recommended that Mother begin parent aide services, parenting classes, substance abuse treatment, random urinalysis testing, and individual counseling (preferably using DBT).

¶10            Based on Dr. Mastikian's recommendations, DCS referred Mother for substance-abuse treatment through TERROS and random urinalysis testing through TASC.  Mother refused to participate in TERROS throughout the two-and-a-half-year dependency proceeding, and only sporadically participated in TASC testing.  By the time the superior court changed the case plan to severance and adoption, in December 2015, Mother had missed fourteen required urinalysis tests and had tested only eight times, two of which resulted in positive tests for benzodiazepines.  Mother missed several more required tests after the change in case plan, and tested positive for benzodiazepines eight times, and once tested positive for both benzodiazepines and opiates.

¶11            Based on Dr. Mastikian's recommendations, DCS referred Mother for a psychiatric evaluation in July 2015; Mother delayed participating for more than a year, until August 2016.  The evaluator diagnosed Mother with generalized anxiety disorder and adjustment disorder with anxiety, noting however, that the persistent anxiety was related to the ongoing DCS investigation.

¶12            Again based on Dr. Mastikian's recommendations, DCS referred Mother for individual counseling in July 2015.  Dr. Mastikian recommended that individual counseling should use DBT, and focus on addressing her underlying traumas, domestic victimization, insight improvement, healthy relationship development, and self-esteem improvement.  He recommended that therapy should also focus on "developing a sense of age-appropriate responsibility and it should focus on attaining long-term objectives such as modifying the underlying dysfunctional thought patterns which have contributed to the development of her personality disorder and her dependence on prescription pain medications."  Mother skipped multiple appointments and delayed her intake until October 2015, and so was unable to complete all of her sessions by the time her referral expired in January 2016.  DCS renewed the referral, and Mother completed her counseling sessions in July 2016.  Her counseling focused on triggers for anger and irritability, healthy communication skills to use with Father and the Children, discussion of her past experiences and building upon her positive traits, and exploring the effects that living in an unsafe and unhealthy home can have on the Children.  Her counseling concluded with Mother telling her counselor that she did not have Munchausen and was only being an overly protective mother.  DCS expressed its concerns regarding the discharge summary's conclusions, as "the objectives identified in the evaluation were not noted in the discharge summary," there were concerns over Mother's self-reporting, and the fact that DBT was not used as the preferred evaluation method.  During his

testimony, Dr. Mastikian additionally related concerns that Mother presented differently in evaluations than in person, and approached testing and evaluations in a defensive manner.

¶13    Mother did participate more fully in therapeutic visitation with the Children through Southwest Human Development ("SWHD") beginning in June 2014.  Similar to DCS's recommendations, SWHD goals were that Mother:  increase her ability to manage her own emotions; reflect upon the reasons why the Children came into care; and gain insight into the suffering that the Children endured due to extensive medical interventions. Even so, Mother failed to show up to visits on time, dressed inappropriately, attempted to provide food even though she was advised not to, incorrectly told the Children they would be coming home soon, and inappropriately used her phone during visits.  Mother struggled to appropriately discipline the Children, and was unable to put their needs first.  The reports from SWHD reflected that Mother emphasized her own emotions and needs at the expense of the Children, a concern exacerbated by research indicating that a parent's inability to place the child's needs ahead of their own was a predictor of recidivism in child maltreatment cases.

¶14    SWHD further reported Mother continued to focus on the Children's perceived medical issues during visits, exaggerating the seriousness of issues, to the extent that the Children used medical issues to get Mother's attention.  Mother continued to focus on her own medical issues during the visitations as well.  SWHD expressed concern about Mother, particularly her deceptiveness, because "it can often be part of the manner in which a parent is able to convince medical professionals to do what the parent wants, even if not medically warranted in reality."

¶15    SWHD noted that Mother made some progress, and at times was "receptive to feedback and appear[ed] to implement the feedback . . . into subsequent sessions."  Mother brought in age-appropriate toys, although they were excessive in number, and Mother expressed love and affection for the Children.

¶16    However, Mother's progress was uneven.  In addition to continued focus on medical issues, SWHD and DCS reported that Mother failed to take responsibility for her Children coming into care, and repeatedly refused to discuss the issue with staff.  It is also noted that Mother was sometimes argumentative and difficult to talk to during feedback discussions, and that they were eventually discontinued due to the difficulties.

¶17　　　　In December 2015, the court found that DCS had "offered a number of services" but "[t]he parents did not avail themselves of the services, as they both believe . . . they did nothing wrong, and there are no circumstances to remedy." Thereafter, the court changed the case plan to severance and adoption, and DCS filed its motion to terminate Mother's parental rights on the mental-illness and fifteen-month out-of-home placement grounds.

¶18　　　　In June 2016, SWHD recommended that visits be decreased to once weekly, "given that the visits [were] increasingly more difficult and unpleasant for the [Children]." After more than two years of therapeutic visitations, SWHD supported a case plan of severance and adoption because of the Children's needs and Mother's lack of progress.

¶19　　　　The superior court held a contested severance hearing over four days in September 2016. The court thereafter issued a ruling terminating Mother's parental rights based on the mental-illness and fifteen-month out-of-home placement grounds. As to the fifteen-month ground, the court found: "[t]he children have been in an out-of-home placement longer than fifteen months"; "[DCS] made diligent efforts to provide appropriate reunification services"; Mother has not "remedied the circumstances that caused the children to be in an out-of-home placement"; and there is a substantial likelihood that Mother will not be capable of exercising proper and effective parental care and control in the near future.

¶20　　　　Mother timely appealed. This court has jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 8-235(A), 12-120.21(A)(1) and 12-2101(A)(1), and Arizona Rules of Procedure for the Juvenile Court 103(A).[4]

## DISCUSSION

¶21　　　　We review the superior court's order severing a parent's rights for an abuse of discretion. *Frank R. v. Mother Goose Adoptions*, 239 Ariz. 184, 190, ¶ 21, 367 P.3d 88, 94 (App. 2016). Because the superior court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, judge the credibility of witnesses, observe the parties, and resolve disputed facts, this court views the evidence and reasonable inferences drawn from it in the light most favorable to sustaining the superior court's decision. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86,

---

[4]　　　　We cite the current version of statutes unless revisions material to this decision have since occurred.

93, ¶ 18, 219 P.3d 296, 303 (App. 2009). This court will not reweigh the evidence, and will not reverse unless no reasonable evidence supports its factual findings. *Id.* If reasonable evidence supports the superior court's order on one of the grounds for termination, it may affirm on that ground and need not consider another. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 49, ¶ 14, 83 P.3d 43, 49 (App. 2004).

**¶22** Parents "have a fundamental right to raise their children as they see fit, but that right is not without limitation." *Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 79, ¶ 14, 41 P.3d 614, 617 (App. 2001). A court may sever those rights if it finds by clear and convincing evidence that one of the statutory grounds for severance is met, and finds by a preponderance of the evidence that severance is in the best interests of the children. A.R.S. § 8-533(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22, 110 P.3d 1013, 1018 (2005).

I.     Statutory Grounds

**¶23** The superior court may terminate parental rights under A.R.S. § 8-533(B)(8)(c) if the children have:

> been in an out-of-home placement for a cumulative total period of fifteen months or longer, . . . the parent has been unable to remedy the circumstances that cause the child[ren] to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future.

Before terminating a parent's rights on the fifteen-month out-of-home placement ground, DCS must make a diligent effort to provide reunification services to the parent. A.R.S. § 8-533(B)(8). DCS fulfills its diligent-efforts obligation if it provides the parent with "the time and opportunity to participate in programs designed to help her become an effective parent." *Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353, 884 P.2d 234, 239 (App. 1994). However, DCS is not required to provide every conceivable service, nor is it required to provide services that are futile. *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶ 15, 256 P.3d 628, 632 (App. 2011). The Children were removed from the home in January 2014, and remained out of the home through the termination of parental rights in November 2016.

¶24 Mother argues that the superior court erred when it held that DCS had proven that Mother had failed to remedy the circumstances that caused out-of-home placement, and that there was a substantial likelihood that Mother would not be capable of exercising proper and effective parental care and control in the near future.[5]

¶25 Mother was reported as a loving and caring parent, however, she continuously refused to acknowledge why the Children were placed in care, and claimed that she was simply following doctor's orders. Reasonable evidence supports the court's finding that "[a]t the beginning and throughout this case, Mother . . . demonstrated a willingness to provide materially false medical histories for her children," and that "the parents did not engage in the services . . . in a way that would remedy the circumstances that required the children to be removed from their care [because] [t]he parents believed that they did nothing that warranted removal of the children."

¶26 Both Ms. Schunk, a clinical supervisor at SWHD, and, Ms. Temple, the DCS supervisor, testified that they worried Mother would continue to be deceptive with doctors and place the Children at risk. SWHD staff testified that "we have nothing to say that the reason the children came into care wouldn't reoccur or any acknowledgement by [Mother] about why [the Children are] in care or what role [Mother] played in that . . . ." Dr. Mastikian wrote in his initial psychological evaluation that Mother's mental illnesses place the Children at risk for future harm based upon a "*guarded to poor*" prognostic impression: that Mother has a substantial amount of work to do in treatment and that treatment would "take quite some time to see genuine and sustained changes in cognition and behaviors." At trial, he testified that he was concerned due to Mother presenting differently in her evaluations than from what was reflected in the record, did not show that she took ownership in the circumstances leading to the Children's removal, and displaced blame and minimized any type of responsibility.

¶27 Mother additionally argues that the superior court erred in finding that DCS made diligent efforts to provide appropriate reunification services.

---

[5] Mother additionally argues that DCS failed to prove the statutory grounds under A.R.S. § 8-533(B)(3), however, we need only find reasonable evidence supports one of the statutory grounds to affirm the termination order. *Mary Lou C.*, 207 Ariz. at 49, ¶ 14, 83 P.3d at 49.

¶28 The record reflects that DCS made a diligent effort to provide reunification services to Mother with a reasonable prospect of success. Mother was provided with numerous reunification services, including: a psychological evaluation; a psychiatric evaluation; individual counseling; therapeutic visitation; random urinalysis testing; and a substance-abuse assessment and testing. The superior court stressed to Mother the need to remedy the circumstances that led to the Children's removal, "and not just halfheartedly engage in some of the services of their choosing, and refuse or fail to engage in others." However, Mother continued to believe that she did nothing wrong, and despite being "offered ample time to remedy the circumstances that caused the out-of-home removal, [she] did not do so."

¶29 Mother argues that reunification services were insufficient because she was not provided with a psychiatric evaluation from a qualified therapist, such as Dr. Bursch. However, Mother was offered an evaluation with Dr. Bursch, but refused to meet with her. Mother delayed meeting with any psychiatrist for more than a year after the Children were removed, delayed counseling services for several months after DCS referred her for services, participated sporadically with random urinalysis testing, and completely failed to participate with TERROS. Mother argues that DCS failed to offer couples counseling, but DCS testified that it was simply not an option given Mother's issues with being in a relationship, and that her individual counseling service never provided notice to DCS that she was ready. The record supports that services beyond those reasonably offered would be futile, as Mother continued to believe that she had done nothing wrong for over two years, and did not rectify any of the issues which led to the Children being removed from her care.

¶30 For the foregoing reasons, we find that there is reasonable evidence in the record to support the superior court's finding that the statutory grounds of § 8-533(B)(8)(c) were met, and that DCS made reasonable efforts to preserve the family relationship.

II.     Best Interests

¶31 Mother, citing her bond with the Children, argues that the superior court erred in concluding it was in the best interests of the Children to sever her parental rights.

¶32 To establish that severance of a parent's rights would be in the children's best interests, "the court must find either that the [Children] will benefit from termination of the relationship or that the [Children] would be harmed by continuation of the relationship." *James S. v. Ariz. Dep't of Econ.*

*Sec.*, 193 Ariz. 351, 356, ¶ 18, 972 P.2d 684, 689 (App. 1998). In making this determination, the court may consider evidence that the children are adoptable or that an existing placement is currently meeting their needs. *Mary Lou C.*, 207 Ariz. at 50, ¶ 19, 83 P.3d at 50.

**¶33** Evidence of a bond is a factor to consider, however, such evidence is not dispositive in addressing the best interests of the children. *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98, ¶ 12, 376 P.3d 699, 701 (App. 2016). "Even in the face of such a bond, the juvenile court is required to evaluate the totality of circumstances and determine whether severance is in the best interests of the children." *Id.* at 99, 376 P.3d at 702. Other factors to consider are the "availability of an adoptive placement," and "whether an existing placement is meeting the needs of the [Children]." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 14, 53 P.3d 203, 207 (App. 2002).

**¶34** The evidence supports the superior court's determination that: termination would be "in the children's best interests"; termination would "benefit the children because it would further the plan of adoption, which would provide the children with permanency and stability"; and "[t]he children are currently in [an] adoptive placement." The DCS case manager testified that the Children need stability and permanency and were currently in a "good home," which was meeting their needs. The placement was diligent in getting the Children to their services, was active in their education, made sure all their appointments were taken care of, and was engaging in parenting classes to help with the Children's behavioral challenges.

## CONCLUSION

**¶35** For the foregoing reasons, we affirm the superior court's order terminating Mother's parental rights.



AMY M. WOOD • Clerk of the Court
FILED: AA

11