IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**FRANK R.,**
*Appellant,*

*v.*

**MOTHER GOOSE ADOPTIONS**
*Appellee.*

---

No. CV-16-0051-PR
Filed October 2, 2017

---

Appeal from the Superior Court in Pima County
The Honorable K.C. Stanford, Judge
No. S20140221
**AFFIRMED**

Opinion of the Court of Appeals, Division Two
239 Ariz. 184 (App. 2016)
**VACATED IN PART, AFFIRMED IN PART**

---

COUNSEL:

Sarah Michèle Martin (argued), Tucson, Attorney for Frank R.

John J. Egbert (argued), Kerry A. Hodges, Jennings, Strouss & Salmon,
P.L.C., Phoenix, Attorneys for Mother Goose Adoptions

Patrick Lacroix, Arizona Children's Law, LLC, Tucson, Attorneys for
Amicus Curiae David and Carolyn Price

---

JUSTICE BRUTINEL authored the opinion of the Court, in which CHIEF
JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICES
TIMMER and BOLICK joined.

---

JUSTICE BRUTINEL, opinion of the Court:

**¶1**        Frank R.'s parental rights were terminated because he did not
register with the Arizona putative fathers registry as required by A.R.S.
§ 8-106.01. Failure to register is a statutory ground for severance, and we

hold that putative fathers must comply with § 8-106.01 to avoid severance pursuant to A.R.S. § 8-533(B)(6). Because Frank did not register, although he had both opportunity and time to do so, the juvenile court did not err when it severed his parental rights.

## I. BACKGROUND

¶2 In the summer of 2013, Rachel (18) and Frank (21), both California residents, developed an intimate relationship, and in early August learned that Rachel was pregnant. Several weeks later their relationship unraveled, and the couple separated. After their separation and during the early pregnancy, Frank did not provide Rachel with financial or emotional support.

¶3 In December 2013, Rachel called the Adoption Network Law Center ("ANLC") to place the expected baby for adoption and gave an advisor Frank's name and home phone number as the likely father. She did not identify any other likely father. In February 2014, Frank told Wendy McGreevy, an attorney at ANLC, "If the baby turns out to be mine, I will 100 percent take the baby and raise it." ANLC subsequently declined to accept the baby for adoption, recognizing that the adoption would likely be contested.

¶4 In March 2014, unbeknownst to Frank, Rachel called Mother Goose Adoptions in Arizona seeking to place her unborn child for adoption. Rachel told Mother Goose she had no idea who the child's father was and did not tell Mother Goose about her rejected application with ANLC (leaving an application question blank). Rachel later signed an affidavit falsely stating no man had acknowledged or claimed paternity of the child or had provided or promised to provide her support during the pregnancy, and there was no person she had reason to believe had an interest in the child.

¶5 On May 5, Rachel gave birth to E.E. in Maricopa County, with the adoptive mother in attendance. Three days later, Rachel executed a Relinquishment of Parental Rights for Adoption, relinquishing her rights to Mother Goose. The next day, Frank asked Rachel about the baby through Facebook, and Rachel responded that the baby was not his. Frank continued to ask about the baby and wrote, "if [it's] mine, [I'm] going to support the baby." Mother Goose filed a petition for termination of the

parent–child relationship and appointment of a guardian for the child on May 14 in Pima County Superior Court.

¶6            In that severance petition, Mother Goose alleged that Rachel resided in Arizona at the hotel it had arranged for her while she was in Phoenix.   Further alleging that the identity of the child's father was unknown, Mother Goose sought to terminate Rachel's rights pursuant to A.R.S. § 8-533(B)(7) and the rights of any potential father pursuant to A.R.S. § 8-533(B)(5), claiming that no putative father had timely served Rachel with a paternity action after service of notice pursuant to A.R.S. § 8-106(G). That notice, which is required in an adoption under A.R.S. § 8-106, was served by publication in Maricopa County, with the last notice appearing in May 2014.  The published notices listed Rachel's address as her Phoenix hotel, instead of her permanent California address, and purported to serve only "John Doe" with no other identifying information.

¶7            On July 30, 2014, the juvenile court terminated the parental rights of "John Doe" and Rachel and relinquished jurisdiction to Tennessee, the adoptive parents' home state, pursuant to A.R.S. § 25-1032(A)(2).

¶8            Meanwhile, Frank had seen a photograph of E.E. on Facebook and believed the child looked like him.  In early July, he filed a petition to establish parental rights in California.  Rachel was served with the California petition on July 30, coincidently the same day the juvenile court here terminated the parental rights of "John Doe."

¶9            Rachel advised Mother Goose of the California petition and Mother Goose requested that the Arizona juvenile court reassert jurisdiction.  In late August, the court granted Mother Goose's request along with its motion to file an amended petition to terminate Frank's parental rights.  Alleging that Frank had failed to file a notice of claim of paternity within thirty days of E.E.'s birth, Mother Goose sought to terminate Frank's parental rights under A.R.S. § 8-533(B)(6).  Mother Goose did not advise the court that Frank had filed a petition in California to establish paternity.

¶10            Frank appeared for a hearing on the California petition on August 28.  Rachel appeared by counsel and moved to quash the California action and to place E.E. in a guardianship pending adoption, stating that an earlier action was pending in Arizona to terminate parental rights.  Frank

learned at that hearing for the first time that E.E. was born in Arizona, that Arizona was E.E.'s home state under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), that Mother Goose had filed a petition to terminate his parental rights in Arizona, and that the baby had been placed with prospective adoptive parents in Tennessee.

¶11 Frank traveled to Arizona and filed a pro se response to Mother Goose's first-amended petition and attended a hearing on October 8. The juvenile court appointed counsel for Frank at that hearing and, at Frank's request, ordered a paternity test, which established him as E.E.'s father. The Arizona court asserted jurisdiction after conferring with the California court, pursuant to the UCCJEA, and conducted the initial severance hearing in December.

¶12 On February 6, 2015, Mother Goose filed a second-amended petition, which alleged abandonment as an additional ground for terminating Frank's rights. The petition also contained two significant factual misstatements. First, Mother Goose incorrectly alleged that at the time of the initial filing Rachel did not know of a person claiming rights to legal custody, physical custody, or visitation with E.E. when, in fact, Rachel knew Frank was making such claims. Second, Mother Goose falsely stated that the birth father was unknown and that Frank "may" be the father when, in fact, biological paternity had been confirmed by DNA testing in October.

¶13 Frank was present each day of the severance adjudication hearing, which took place over six days from February until April 2015. Following the hearing, the juvenile court severed Frank's parental rights, after finding his failure to register with the putative fathers registry as the sole statutory ground and further finding that severance was in E.E.'s best interests.

¶14 The court found that the requirement of timely registration with the putative fathers registry applied, and that Frank had not registered despite having had the ability to do so "notwithstanding [Rachel's] fraudulent practices." The court also found that Mother Goose failed to establish abandonment and that Rachel's conduct was deceitful and designed to prevent Frank from asserting his parental rights.

¶15        The court of appeals affirmed in a split decision. *Frank R. v. Mother Goose Adoptions*, 239 Ariz. 184, 203 ¶ 65 (App. 2016). It reviewed de novo the juvenile court's interpretation and application of A.R.S. § 8-533(B)(6), concluding that the juvenile court had correctly applied the statute. *Id.* at 190 ¶ 22, 203 ¶ 65. The court of appeals reasoned that the primary deception had already occurred by the time the thirty-day period commenced and, like the juvenile court, noted that Frank had the ability to register notwithstanding Rachel's fraudulent conduct and, on his lawyer's advice, chose not to do so. *Id.* at 199 ¶ 48. The dissenting judge asserted that, "under all the circumstances of this case, Frank's failure to file a superfluous notice of paternity pursuant to § 8-106.01 should not constitute grounds for terminating his parental rights." *Id.* at 205 ¶ 73 (Eckerstrom, C.J., dissenting).

¶16        We granted review to determine whether compliance with A.R.S. § 8-106.01 may be excused, allowing the father to avoid severance under A.R.S. § 8-533(B)(6). We exercise jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II.        DISCUSSION

¶17        We review the juvenile court's order terminating Frank's parental rights for an abuse of discretion. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3 ¶ 9 (2016); *In re Pima Cty. Juvenile Severance Action No. S-114487*, 179 Ariz. 86, 100–01 (1994). Questions of law and statutory interpretation are reviewed de novo. *David C. v. Alexis S.*, 240 Ariz. 53, 55 ¶ 8 (2016).

### A. Arizona's Putative Fathers Registry

¶18        The Arizona putative fathers registry was established in 1994. *See* H.B. 2462, 1994 Leg., 2d Reg. Sess. (Ariz. 1994). Codified as A.R.S. § 8-106.01, subsection A states in pertinent part:

> A person who is seeking paternity, who wants to receive notice of adoption proceedings and who is the father or claims to be the father of a child shall file notice of a claim of paternity and of his willingness and intent to support the child to the best of his ability with the state registrar of vital statistics in the department of health services.

Under § 8-106.01(B), "[t]he notice of a claim of paternity may be filed before the birth of the child but shall be filed within thirty days after the birth of the child."

**¶19** In *Lehr v. Robertson*, the United States Supreme Court ruled that New York's "putative father registry" was a constitutional means of expediting adoption procedures. 463 U.S. 248, 250, 265 (1983). The Court suggested that the registry's creation was prompted by that Court's decision in *Stanley v. Illinois*, 405 U.S. 645 (1972). *Robertson*, 463 U.S. at 263. *Stanley* held that an Illinois law that conclusively presumed every father of a child born out of wedlock was unfit to have custody of his children was unconstitutional as a violation of the Equal Protection Clause of the Fourteenth Amendment. *See Stanley*, 405 U.S. at 649, 656, 658.

**¶20** Arizona's registry was created, as the juvenile court judge noted, "to avoid protracted legal disputes between unwed fathers and potential adoptive parents." *See also* Ariz. State Sen. Fact Sheet for H.B. 2462, 41st Leg., 2d Reg. Sess. (Apr. 6, 1994) (stating that the aim of enacting H.B. 2462 was to "clarify the responsibilities of the birth mother of a child being placed for adoption and the rights and obligations of a putative father in the adoption context in the State of Arizona."); Ariz. State Sen. Minutes of Comm. on Judiciary, 41st Leg., 2d Reg. Sess. 2 (March 15, 1994) (statement of Rep. David Eberhart, cosponsor of H.B. 2462) (explaining that "the bill is necessary to close loopholes in the law to avoid cases such as the national one involving 'Baby Jessica'"). At least twenty-five states, including Arizona, have created putative father registries. The Rights of Unmarried Fathers, Children's Bureau, https://www. childwelfare.gov/systemwide/laws_policies/statutes/putative.cfm. (last visited Aug. 10, 2017).

**¶21** Arizona's severance statute, A.R.S. § 8-533(B), states in relevant part:

> B. Evidence sufficient to justify the termination of the parent–
> child relationship shall include any one of the following, and
> in considering any of the following grounds, the court shall
> also consider the best interests of the child:
>
> .   .   .   .

6

6. That the putative father failed to file a notice of claim of paternity as prescribed in § 8-106.01.

A.R.S. § 8-533(B)(6). This statute makes failure to file a notice of claim with the putative fathers registry an independent ground for severance. It is undisputed that Frank did not file such a claim.

¶22 The policy reasons for the strict deadline are compelling and were reflected in our case law before creation of the registry. *In re Pima Cty. Juvenile Severance Action No. S-114487* reasoned that prompt finality that protects the child's interests in a stable, permanent placement — either with a biological parent or an adoptive parent — is paramount. 179 Ariz. at 97. "The law favors rapid placement so that the child can bond with those who will be the legal parents and not with those from whom the child may be taken. This sound policy benefits the child, the natural parents, the prospective adoptive parents, and society." *Id.*; *see also Lehr*, 463 U.S. at 263.

¶23 Both the majority and the dissent below framed the issue in this case as one of substantial versus strict compliance with § 8-106.01. But that distinction is irrelevant because Frank does not argue that he complied with § 8-106.01. Rather, he asserts that he fulfilled the underlying legislative purpose of § 8-106.01 by filing to establish paternity and contesting the severance and that any delay in doing so was caused by the misconduct of the mother and Mother Goose. As stated, the purpose of the putative fathers registry is to provide the father with an opportunity to claim his parental rights, to give potential adoptive parents notice of the putative father's paternity claim early in the proceedings, and to preclude claims of paternity made more than thirty days after the child's birth. *See* Fact Sheet for H.B. 2462. Because Frank's actions made the other parties aware of his intent to assert his parental rights, he argues that the legislature could not have intended that he "perform a futile and superfluous act" by also filing with the putative fathers registry to preserve his right to parent. As a corollary, Frank argues that he should be excused from complying with § 8-106.01 because of the misconduct by Rachel and Mother Goose.

¶24 Arizona's registry reflects our legislature's attempt to appropriately balance the interests of the child and the constitutional rights of parents. Ariz. State Sen. Fact Sheet for S.B. 1287, 45th Leg., 2d Reg. Sess. (May 15, 2002). Section 8-106.01 provides a bright-line deadline for

registration and establishes a clear date after which an adoption is final and the child's placement with his or her new family is permanent. The statute recognizes the putative father's interest in establishing paternity and having a role in his child's life and weighs it against the child's interest in having a stable and permanent home and not being removed from adoptive parents with whom the child has bonded. Section 8-106.01 also protects the interest of adoptive parents in the finality of the adoption and assures prospective adoptive parents that a final order of adoption is likely to remain final. Similarly, to ensure compliance with its strict timeline for asserting paternity, the legislature made failure to comply with § 8-106.01 a ground for severance in § 8-533(B)(6).

¶25    We agree with the court of appeals here that "creating a fact-based excuse for [non]compliance with the [registry] statute" is not consistent with the legislature's intent in enacting § 8-533(B)(6). *Frank R.*, 239 Ariz. at 200 ¶ 50. Although requiring compliance with the statute may sometimes result in harsh outcomes, requiring courts to make an individualized, post-adoption determination of whether the father's conduct reasonably complied with the statute's purpose would undermine legislative intent and the finality of adoptions. *See Beltran v. Allan*, 926 P.2d 892, 897 (Utah App. 1996) (citing *Wells v. Children's Aid Soc'y*, 681 P.2d 199, 208 (Utah 1984) (holding analysis of whether father had "reasonable opportunity" in each individual adoption case to comply with statutory requirements "would frustrate the statute's purpose to facilitate secure adoptions by early clarification of status"), *abrogated on other grounds by In re Adoption of J.S.*, 358 P.3d 1009, 1024 (Utah 2014)); *see also Heidbreder v. Carton*, 645 N.W.2d 355, 369–70 (Minn. 2002) (reasoning that the Minnesota Legislature intended strict compliance with the Fathers' Adoption Registry under its statute because creating a substantial-compliance exception when father missed the deadline by one day would undermine the goal of securing permanent and stable adoptive placements).

¶26    In *Lehr*, the United States Supreme Court noted that the state's legitimate interests in expeditious permanency "justify a trial judge's determination to require all interested parties to adhere precisely to the procedural requirements of the statute." 463 U.S. at 265. As the court of appeals here reasoned, "[N]othing in § 8-533(B)(6) states or even suggests that filing a paternity action, whether in Arizona or another state, takes the place of the putative father's obligation to file a notice under the putative fathers registry." *Frank R.*, 239 Ariz. at 201 ¶ 54. The statute must be

applied as written; to hold otherwise would directly contradict the plain language of § 8-533(B)(6). Because Frank did not timely register as a putative father after he had the opportunity to do so, he did not comply with the statute. Neither filing notice of a claim of paternity nor contesting the severance action excuses a putative father's failure to register for purposes of § 8-533(B)(6).

¶27 Frank cites our opinion in *David C.* as support for his position, arguing that because he met the purpose of § 8-106.01, we should excuse his failure to comply with its express terms. Frank's reliance on *David C.* is misplaced, however, as that case is factually distinguishable. We stated in *David C.* that "the registry requirement in A.R.S. § 8–106.01 supplements but does not supplant the provisions of the adoption statute, A.R.S. § 8-106." *David C.*, 240 Ariz. at 57 ¶ 22. Accordingly, a timely served paternity action preserved the father's right to notice of the adoption hearing and required his consent to an adoption, even though he failed to register. *Id.* at 57 ¶ 18, 58 ¶ 24.

¶28 Unlike *David C.*, this is a severance action, not an adoption action, and Frank's rights were not terminated for failing to timely file a paternity action. Rather, Frank's rights were terminated under § 8-533(B)(6) on the independent ground that he failed to register with the putative fathers registry as § 8-106.01 requires.

¶29 Although both address parental rights, *David C.* and this case are distinguishable because they concern different statutes. In *David C.*, we held that "[b]ecause Father timely filed and served a paternity action in compliance with A.R.S. § 8-106(J) . . . he preserved his right to establish paternity despite his failure to strictly comply with the putative father registration requirement." 240 Ariz. at 54 ¶ 1. In that case, we granted review "to consider the interaction between A.R.S. §§ 8-106(G) and 8-106.01(E)." *Id.* at 55 ¶ 7. Section 8-106 does not require compliance with § 8-106.01 to maintain a paternity action. *See* A.R.S. § 8-106. Thus, the fact that the father in *David C.* never filed a claim of paternity with the putative fathers registry had no bearing on his compliance with § 8-106.

¶30 Here, on the other hand, § 8-106.01 specifically requires the father to file a notice of claim of paternity, which Frank failed to do, despite appearing in the Arizona severance case and having counsel appointed. Frank's rights were not terminated for failure to timely file a paternity

9

action under § 8-106(J); rather, as noted above, they were terminated on the independent ground that he failed to register with the putative fathers registry under § 8-106.01, and § 8-533(B)(6) identifies such a failure as a ground for severance. Even if we assume Frank's California paternity action satisfies the § 8-106(J) requirement, he was still required to register with the putative fathers registry and failed to do so. Had Frank timely and properly registered with the putative fathers registry, this case would have a different outcome.

**B. Due Process Considerations**

¶31 Frank asks this Court to impute a requirement for proper service of notice under § 8-106(G) to commence the time for registering as a putative father based on the entirety of the statutory scheme. Section 8-106(G) states in relevant part, "Notice shall be served on each potential father as provided for the service of process in civil actions . . . ." In the adoption context, a putative father who properly files a notice of claim of paternity is treated as a potential father under § 8-106(F) and is entitled to be served with notice of the planned adoption of his child pursuant to § 8-106(G); *see David C.*, 240 Ariz. at 57–58 ¶ 22.

¶32 In this case, the required § 8-106(G) notice was never served on Frank due to both Rachel and Mother Goose's misrepresentations. Yet Frank had actual notice that Mother Goose sought to sever his parental rights from the time he received the first-amended severance petition, which alleged his failure to register with the putative fathers registry as a ground for severance under § 8-533(B)(6). *Cf. State v. Lua*, 237 Ariz. 301, 306 ¶ 17 (2015) (reasoning that defendant was not actually prejudiced by a new or amended charge because defendant had actual notice of the charge). Thus, because Frank had actual notice of the proceedings and an opportunity to timely register, his procedural due process rights were not violated. As the juvenile court reasoned, "[T]he time limit [in which to register] began to run no later than October 8, 2014 when he was appointed Arizona counsel. As such, he was required to register no later than November 7, 2014" — giving Frank leeway to register a full six months after E.E.'s birth.

¶33 We agree with the court of appeals and the juvenile court that this case can only have an unsettling outcome. We also agree with both courts that this case raises serious concerns about the conduct of Mother

Goose and its counsel in the superior court. Our decision has the practical effect of depriving a father, who at least since E.E.'s birth has asserted his desire to parent his child, of any legal rights to his child.

¶34        The juvenile court record reflects that for almost the entire term of the pregnancy, Frank knew that Rachel was pregnant and that he was probably the father. The record also reflects the juvenile court's findings that Frank took a wait-and-see attitude rather than providing prenatal support to Rachel and his unborn child. But Frank's conduct before the child's birth does not excuse Rachel's conduct. Rachel concealed her travel to Arizona, E.E.'s birth in Arizona, and her intention to place the child for adoption. She did so to prevent Frank from asserting paternity and seeking custody of the child. As the court of appeals aptly observed, Mother Goose made "blatant misrepresentations" and "materially inaccurate allegations" to the juvenile court to facilitate Rachel's misconduct. *Frank R.*, 239 Ariz. at 202–03 ¶ 62.

¶35        We deplore the conduct of Rachel and Mother Goose. We recognize that a mother who seeks to deceive the father of her child and the adoption agency that assists her may read this opinion as tacitly permitting such conduct. But we agree with both the court of appeals and the juvenile court that such misconduct — when the mother intentionally deceives the father — would be futile as long as the father "registers with the putative father [sic] registry within thirty days of prompt discovery of the Arizona birth, which would eliminate § 8-533(B)(6) as a ground for termination of a father's rights." *Id.* at 203 ¶ 65 (internal quotation marks omitted).

¶36        In its order granting severance, the juvenile court gave "special and presumptive weight" to Frank's desire to raise his child. The court also considered other factors, including the child's need for a "loving, permanent and continuous home and family life during his childhood" with the only parents this child has ever known. The juvenile court found that severance was in the child's best interest. That determination was upheld by the court of appeals and we declined review of that issue. Affirming severance of Frank's parental rights under the facts of this case is a harsh result. But separating the child from the adoptive parents would likewise be a harsh result. Based on the clear language of § 8-533(B)(6), we will not disregard the child's best interests to punish Rachel and Mother Goose for their unconscionable behavior.

### III. CONCLUSION

¶**37**        Frank's failure to register as required by § 8-106.01 constituted a statutory ground for severance under § 8-533(B)(6). We affirm the juvenile court's order terminating Frank's parental rights and vacate paragraphs 28–56 of the court of appeals' opinion. The court of appeals' opinion is otherwise affirmed, including its award of sanctions against Mother Goose and its counsel.