NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MARIA O., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, P.A., L.A., *Appellees*.

No. 1 CA-JV 17-0070
FILED 1-4-2018

Appeal from the Superior Court in Maricopa County
No. JD19172
The Honorable Alison S. Bachus, Judge

**AFFIRMED**

COUNSEL

Law Office of H. Clark Jones, LLC, Mesa
By H. Clark Jones, III
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Amber E. Pershon
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Diane M. Johnsen and Judge Maria Elena Cruz joined.

---

**W I N T H R O P**, Presiding Judge:

**¶1**        Maria O. ("Mother") appeals the juvenile court's order terminating her parental rights to her biological children, P.A. and L.A. ("the children"), on the grounds of mental illness or deficiency and fifteen months' out-of-home placement.[1]  *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(3), (8)(c) (Supp. 2017).  Mother does not argue the court erred in finding that severance was in the children's best interests or challenge the statutory bases for severance found by the court except to argue the court erred in finding the Department of Child Safety ("DCS")[2] proved it made diligent efforts to provide her appropriate reunification services or that such efforts would have been futile.  For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY[3]

**¶2**        P.A. and L.A. were born in 2007 and 2010, respectively. Mother suffers from dependent personality disorder and depression, which inhibits her ability to safely parent the children.  Father suffers from chronic schizophrenia, which causes him to experience command hallucinations. Father has engaged in multiple instances of domestic violence involving Mother and the children.

---

[1]     The juvenile court also terminated the parental rights of the children's biological father ("Father"), but he is not a party to this appeal.

[2]     Over the course of this case, DCS replaced Child Protective Services ("CPS"), a division of the Arizona Department of Economic Security ("ADES").  References to DCS in this opinion encompass actions by ADES and the former CPS.

[3]     We view the facts and reasonable inferences therefrom in the light most favorable to upholding the juvenile court's order.  *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

¶3            In May 2010, DCS filed a dependency petition, alleging neglect due to domestic violence in the home[4] and concerns about Mother's inability to discipline P.A.  After an in-home intervention, pursuant to which DCS provided family preservation services, the court dismissed the dependency petition in March 2011.

¶4            In May 2012, DCS filed a second dependency petition, alleging in part that Father had committed domestic violence in the presence of the children, abused P.A., engaged in sexually inappropriate behavior in the children's presence, and had not addressed his mental health concerns, including taking his medication for schizophrenia.  DCS alleged Mother refused to leave Father and protect the children from domestic violence and P.A. from Father's abuse.

¶5            The juvenile court found the children dependent and ordered DCS to offer Mother parent-aide services, visitation, transportation, a psychological consultation, a psychiatric evaluation, and domestic violence counseling services.  Further, the court ordered DCS to provide any services Mother could not access through her own provider, Magellan.  DCS asked Mother to self-refer for mental health services, acquire stable employment and housing, and have no contact with Father.

¶6            Throughout much of the case, Mother maintained contact with Father against DCS' instructions, and told various DCS representatives that she intended to reunify with Father after the children were returned to her.  Nonetheless, by December 2012, Mother had obtained an order of protection against Father[5] and filed for divorce, which she obtained in February 2013.  In June 2013, DCS offered intensive counseling for Mother due to its concern that she was co-dependent.

¶7            Two months later, DCS moved to dismiss the dependency petition.  Mother had been participating in services, including individual counseling, parent-aide services, and classes to address co-dependency issues with Father.  Mother reported seeking another order of protection against Father, moving, and changing her telephone number.  The juvenile court denied DCS' motion to dismiss, however, and ordered DCS to refer a

---

[4]        Father had allegedly held a knife to Mother's throat and threatened to kill her in front of the children.

[5]        Mother testified she obtained at least four orders of protection against Father.

family reunification team to facilitate overnight visits between Mother and the children.

¶8         On October 30, 2013, DCS moved to return the children to Mother's physical custody because she had fully complied with the recommended services. Within a month, however, Mother told DCS she had lost her employment, had no means of transportation, and was unable to provide for the children. She asked permission to accept financial assistance from Father's family and permitted the children's former foster placement to care for the children overnight and on weekends to ensure their needs were met. DCS authorized child-care services for Mother to assist with her job search and sought to assist her with a housing subsidy. By late December 2013, however, Mother was still unemployed and communicated thoughts of suicide to the foster mother. The children were removed from Mother's home in December 2013 and remained out of her home through the termination of parental rights in December 2016.

¶9         DCS moved for a change in physical custody, which the juvenile court granted in January 2014. Meanwhile, Mother spent Christmas with Father. Over the ensuing months, Mother lacked stable housing, continued to display erratic behavior and emotional instability, stalked members of the foster family, and renewed contact with Father.

¶10         DCS gave Mother referrals for a second parent aide, Ph.D.-level counseling, psychiatric services, and resources for domestic violence classes. Mother completed the psychiatric evaluation in October 2014 and was prescribed medication for depression. When she lost her job later in the month, Mother again sought assistance from Father, who rented her a motel room. In November, she again turned to Father and his family for help despite having an active order of protection against Father, and was with him when he was arrested for violating the order of protection.

¶11         In January 2015, the juvenile court granted DCS' contested motion to change the case plan to severance and adoption. In February 2015, DCS moved to terminate Mother's parental rights.

¶12         In October 2015, Mother accompanied Father to a criminal defense attorney's office, despite having an order of protection in place. That same month, Mother underwent a psychological evaluation by Dr. James Thal, who diagnosed her with chronic depression and dependent personality disorder. The next month, Mother encountered Father at a church function and left the event with him. Mother later informed her case

manager that she intended to reunite with Father if the children were returned to her. In February 2016, Mother again had contact with Father.

**¶13** The juvenile court held the contested severance hearing over seven days between May and December 2016. On February 7, 2017, the court issued its order terminating Mother's parental rights on the grounds of mental illness or deficiency and fifteen months' out-of-home placement.

**¶14** We have jurisdiction over Mother's timely appeal pursuant to A.R.S. §§ 8-235(A) (2014), 12-120.21(A)(1) (2016), and 12-2101(A)(1) (2016).

## ANALYSIS

**¶15** Mother argues the juvenile court erred in finding DCS made diligent efforts to provide appropriate reunification services; specifically, she takes issue with the parent-aide, housing-assistance, and counseling services offered to her. Even assuming Mother did not waive her argument, reasonable evidence supports the court's finding that DCS satisfied the diligent-efforts requirement by clear and convincing evidence.

**¶16** We review the juvenile court's severance of parental rights for an abuse of discretion. *Frank R. v. Mother Goose Adoptions*, 239 Ariz. 184, 190, ¶ 21 (App. 2016). As the trier of fact in a termination proceeding, the juvenile court is in the best position to weigh the evidence, observe the parties, judge witnesses' credibility, and resolve disputed facts. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (citation omitted).

**¶17** A court may sever a parent's rights if it finds by clear and convincing evidence that one of the statutory grounds for severance is met and finds by a preponderance of the evidence that severance is in the best interests of the children. A.R.S. § 8-533(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005).

**¶18** Before terminating a parent's rights under § 8-533(B)(8)(c), the court must find DCS made a diligent effort to provide appropriate reunification services to the parent. A.R.S. § 8-533(B)(8)*; see also Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999) (requiring efforts to reunify the family before termination due to mental illness). DCS fulfills its diligent-efforts obligation if it provides the parent "with the time and opportunity to participate in programs designed to help her become an effective parent." *Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). However, DCS is not required to provide every conceivable service, ensure a parent participates in each service, or provide services that are futile or without a reasonable prospect of success. *Christina G. v. Ariz.*

*Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶ 15 (App. 2011) (citations omitted);
*Mary Ellen C.*, 193 Ariz. at 192, ¶ 34.

### I. Parent Aide – Interpreter

**¶19** Mother is a native Brazilian whose first language is Brazilian Portuguese, and she argues that reunification services were insufficient because she was not provided with a Portuguese-speaking parent aide or interpreter with her parent aide, as was recommended by Dr. Thal after her October 2015 psychological evaluation. She further argues that DCS should have provided her with other service providers who spoke Brazilian Portuguese or were accompanied by interpreters who did so. The record shows, however, that Mother speaks English and possesses a level of English comprehension sufficient to freely communicate and take advantage of services provided in English.[6] Moreover, she successfully completed two parent-aide referrals, apparently without ever expressing difficulty with a language barrier.[7] Nonetheless, even after Mother's successful completion of the parent-aide referrals, Mother's issues of instability and co-dependency—neither of which the parent-aide services were designed to address—remained, threatening the children's safety. Further, Mother testified during five of the seven trial days, affording the juvenile court considerable time to carefully observe her before finding she understood questions in English and was fully conversant in English. The juvenile court did not abuse its discretion in concluding that reunification services were sufficient despite the lack of service providers or interpreters who spoke Brazilian Portuguese.

### II. Housing Assistance

**¶20** Mother also argues DCS failed to provide her with housing assistance, which forced her to live in shelters or her car, or to rely on Father for housing. However, Mother initially received vocational and housing resource assistance, and by December 2012, had obtained employment and

---

[6] At the severance trial, several of Mother's service providers testified Mother had no difficulty communicating with them in English, and Mother repeatedly stated she was comfortable speaking English and desired an interpreter only because she became nervous during legal proceedings.

[7] Mother does not claim on appeal that she ever complained that her parent aides or other service providers did not speak Brazilian Portuguese, and at trial, Dr. Thal acknowledged she likely would have expressed difficulty with a language barrier if she believed one existed.

her own apartment. Nonetheless, Mother was unable to maintain steady employment, largely due to attendance and emotional issues, and her housing issues were the direct result of her inability to maintain employment. DCS also provided Mother with transportation assistance in the form of bus passes, authorized child-care services for Mother to assist with her job searches, and in approximately December 2013, submitted a referral for a housing subsidy. However, DCS did not follow up on the referral because shortly thereafter, the children were returned to the foster placement due to Mother's emotional instability and suicidal ideations, and the housing subsidy required Mother to have custody of the children. Over approximately four and one-half years, Mother struggled to maintain employment — and therefore stable housing. Reasonable evidence supports the conclusion that DCS made diligent efforts to provide Mother with appropriate reunification services designed to help her obtain steady employment, income, and housing, and that further efforts would have been futile.

### III. *Additional Mental Health Services*

¶21 Mother argues DCS should have referred her for additional counseling and another psychiatric evaluation after her October 2015 psychological evaluation with Dr. Thal, who recommended she "make contact again with her psychiatric provider and consider re-starting her antidepressant medication," and "continue working with a therapist to address depression and [her] dangerously unhealthy dependence on [Father]." After Dr. Thal's evaluation, DCS asked Mother to self-refer to her previous provider, Jewish Family and Children Services, for counseling and medication regulation, and she received additional mental health services and counseling through Dr. Mark Magier from July through November 2016 pursuant to a referral by DCS.[8] Further, Mother admits she "was able to find counselors/therapists on her own throughout the case," and does not allege, much less show, that the services she received were inadequate or explain how any additional services would have benefitted her. Moreover, Dr. Thal opined that the safety and welfare of the children would be jeopardized if they were in Mother's care and custody, and he recommended they not be reunited with her if she remained in her "unhealthy and volatile relationship" with Father, a relationship she continued throughout the dependency, including during the severance trial. Accordingly, Dr. Thal concluded it would "likely be necessary to consider alternative long[-]term placement plans for the children." On this record, the juvenile court did not err in finding that DCS made reasonable

---

[8] Dr. Magier noted that Mother needed to stay away from Father.

and/or diligent efforts to provide reunification services and any additional services beyond those offered would be futile.

**CONCLUSION**

**¶22** Although Mother participated in numerous services offered by DCS and through other providers over several years, Mother did not rectify the core issues that led to the children being removed from her care. Accordingly, we affirm the juvenile court's severance order.



AMY M. WOOD • Clerk of the Court
FILED: AA